Charles W. DEPENDAHL, Jr. and
William J. Healy, Appellees,
Cross-Appellants,

v.

FALSTAFF BREWING CORPORATION,
a Delaware corporation, and Paul Kalmanovitz, Appellants, Cross-Appellees.

John C. CALHOUN, Appellee,
Cross-Appellant,

v.

FALSTAFF BREWING CORPORATION,
a Delaware corporation, and Paul Kalmanovitz, Appellants, Cross-Appellees.

Nos. 79–2050, 80–1714, 80–1861
and 80–1900.

United States Court of Appeals,
Eighth Circuit.

Submitted March 11, 1981.

Decided June 30, 1981.

Rehearing and Rehearing En Banc
Denied July 27, 1981.

Theodore F. Schwartz (argued), Barry S. Ginsburg, Clayton, Mo., for appellants/cross-appellees.

Carroll J. Donohue, Harry B. Wilson, Mark G. Arnold (argued), Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for appellees, cross-appellants.

Before BRIGHT, Circuit Judge, GIBSON, Senior Circuit Judge, and ROSS, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

This appeal concerns federal issues arising under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (1976) (ERISA), together with pendent state claims for tortious interference and fraud. Falstaff Brewing Corporation and Paul Kalmanovitz, controlling shareholder of Falstaff, appeal the district court's[1] findings that Kalmanovitz interfered with the contractual relationship between Falstaff and three former executive officers, Charles W. Dependahl, Jr., William J. Healy, and John C. Calhoun, resulting in tortious Missouri common-law and ERISA statutory violations. Falstaff and Kalmanovitz also appeal the district court's award of punitive damages, attorney fees, and prejudgment interest. Finally, Falstaff and Kalmanovitz appeal the district court's discovery sanction of dismissing their counterclaims and affirmative defenses. The former executive officers cross-appeal the district court's failure to find fraud and tortious interference by Kalmanovitz with respect to their employment contracts. With respect to the direct appeal, we affirm the district court on its findings of ERISA violations, the award of attorney fees, and the imposition of discovery sanctions. We reverse the court on its award of punitive damages and its computation of prejudgment interest. With respect to the cross-appeal, we affirm the district court.

## I.

### A.

In late 1974, Falstaff was experiencing severe financial difficulties. Kalmanovitz, a brewer and entrepreneur, was contacted by Falstaff, which was in need of new capital. After a series of meetings, Kalmanovitz and Falstaff signed an agreement on March 10, 1975, whereby Kalmanovitz would purchase ten million dollars of newly issued preferred stock and would personally guarantee ten million dollars of Falstaff's debts, in return for voting control of the corporation.

---

1. The Honorable John F. Nangle, United States District Judge, Eastern District of Missouri.

In order for the deal to go through, the articles of incorporation had to be amended by the shareholders. On April 28, 1975, the stockholders met and approved the deal.

On May 1, 1975, Kalmanovitz terminated Dependahl, former vice-president and director of marketing, and Healy, former vice-president, secretary, and treasurer of Falstaff. Later, on August 8, 1975, Calhoun, secretary and treasurer since May 1, was terminated by Kalmanovitz.

Prior to the terminations, these former officers appear to have been under the impression that because the takeover by Kalmanovitz was not opposed, top management would be retained. Following the terminations, Kalmanovitz directed that severance payments to Healy and Dependahl be stopped. Falstaff subsequently made an offer to each that the severance payments would be resumed if Healy and Dependahl would waive their rights to the CBS plan, a whole-life insurance program for executives. The former executives refused and severance payments were never resumed.

Calhoun, at the time of his termination, had not been employed by Falstaff for the required period of fifteen years necessary to receive severance payments. Calhoun, therefore, did not receive any payments after his termination. The severance plan, however, had only recently been amended in June 1975 to provide for a fifteen-year employment period.

### B.

Dependahl and Healy filed suit against Falstaff and Kalmanovitz on August 8, 1975. A few months later, on January 13, 1976, Calhoun brought suit. Essentially, all three sought both common-law and ERISA statutory relief resulting from the termination of the severance payments and alleged interference with the CBS plan. In 1977, the parties entered into a settlement agreement which was enforced, pursuant to the terminated executives' petition, by the district court. *Dependahl v. Falstaff Brewing Corp.*, 448 F.Supp. 813 (E.D.Mo.1978). Pending appeal to this court, the parties both stated that they wished to try the case on its merits. This court then vacated the settlement order. *Dependahl v. Falstaff Brewing Corp.*, 594 F.2d 869 (8th Cir. 1979).

On December 10, 1979, the district court, upon the former executives' motion, imposed discovery sanctions on Falstaff pursuant to Federal Rule of Civil Procedure 37(b). *Dependahl v. Falstaff Brewing Corp.*, 84 F.R.D. 416 (E.D.Mo.1979). The court struck Falstaff's affirmative defenses and counterclaims, due to Falstaff's refusal to properly and timely respond to interrogatories. Falstaff filed a timely notice of appeal from the order. On January 10, 1980, this court granted Falstaff leave to stay its appeal until the district court entered final judgment in the case.

On December 17, 1979, trial was commenced before the court, without a jury, and continued for six days. On February 15, 1980, after trial briefs were filed, the court took the matter under submission. On June 9, 1980, the court entered its order granting relief to the former executives on the ERISA and tortious-interference-with-contract claims, but denied relief on a fraud claim. *Dependahl v. Falstaff Brewing Corp.*, 491 F.Supp. 1188 (E.D.Mo.1980). Post-trial motions were denied by the court on July 2, 1980.

On July 15, 1980, the district court conducted a hearing on the amount of attorney fees to be awarded the former executives under the ERISA attorney fees statute. 29 U.S.C. § 1132(g) (1976). On August 28, 1980, the court entered its order and memorandum opinion awarding $149,175 in attorney fees, and expenses of $13,000. *Dependahl v. Falstaff Brewing Corp.*, 496 F.Supp. 215 (E.D.Mo.1980).

### C.

In its memorandum opinion of June 9, 1980, concerning the merits of the case, the district court found both the severance policy and the CBS plan to be within the coverage of ERISA. 491 F.Supp. at 1194, 1196. The court then concluded that Falstaff violated its fiduciary duty to Calhoun by changing the terms of the plan in contem-

plation of mass terminations. With respect to the CBS plan, the court enjoined Falstaff from borrowing against the cash values of the life insurance policies. *Id.* at 1196–97. The court awarded prejudgment interest on the severance payments at the rate of nine percent per annum.

Next, the court found Kalmanovitz liable for punitive damages in the amount of $50,-000 to each former executive for tortious interference with contract involving the severance payments and the CBS plan. The trial court concluded that Kalmanovitz did not act in good faith in terminating the former executives. Accordingly, the court refused to grant Kalmanovitz any common-law privilege to induce a breach of contract. Finally, the court dismissed Dependahl's and Healy's claims that Kalmanovitz fraudulently misrepresented that they would be retained after the takeover. The court found that no misrepresentations on continuing employment were made. *Id.* at 1198–99.

## II.

We first address the issue of whether the district court abused its discretion in ordering that Falstaff's affirmative defenses and counterclaims be stricken as a discovery sanction pursuant to Federal Rule of Civil Procedure 37(b).[2] Falstaff argues that the trial court's sanctions were unduly harsh, given the factual circumstances surrounding the interrogatories posited by the former executives. Falstaff also contends that a Rule 37(b) sanction may be imposed only if a Rule 37(a) order is in force. In Falstaff's view, no such order was in effect. Our review of the record leads us to a different conclusion concerning the factual circumstances surrounding the discovery sanctions.

 The district court's reported memorandum concerning the sanctions contains ample factual findings to support the imposition of sanctions. On March 27, 1978, Falstaff was ordered, pursuant to Rule 37(a), to respond to the former executives' interrogatories. The settlement negotiations then intervened. *See ante* at 1211. After the settlement was vacated, the three former executives again tried to obtain discovery. Finally, on October 11, 1979, Falstaff filed answers. These answers had been prepared a year and a half earlier. The district court concluded that

[t]here is absolutely no excuse, however, for defendant's not having served the answers when plaintiffs renewed their request in March of 1979. To delay seven additional months during which time the answers were already prepared and ready for service is clearly inexcusable, especially in light of the obviously incomplete and evasive nature of these answers. Defendant clearly sought to delay and obstruct plaintiffs' legitimate discovery re-

---

2. Federal Rule of Civil Procedure 37(b)(2) provides:

(2) *Sanctions by court in which action is pending.* If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

\* \* \* \* \* \*

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

quests, a tactic which can not be tolerated under the voluntary scheme of discovery envisioned by the Federal Rules of Civil Procedure.

\* \* \* \* \* \*

It is apparent to this Court that defendant has engaged in a continuous pattern of delay and obstruction. It is also apparent that this delay has been caused as much by defendant itself as by its counsel. Falstaff has changed counsel numerous times, each change further delaying the orderly disposition of this lawsuit. Though this Court normally does not question a litigant's desire to change counsel, when it is done as repeatedly as has defendant in this case, this Court must strongly presume that it is done more as a dilatory tactic than in a legitimate desire to engage substitute counsel. *Dependahl v. Falstaff Brewing Corp.*, 84 F.R.D. at 418–19.

The district court further found that the March 27, 1978, Rule 37(a) order was still in force and "carried with it the implicit condition to answer fully and completely." *Id.* at 419. We agree with the trial court that a Rule 37(a) order was in effect at the time the sanctions were imposed. We recognize that a Rule 37(b) sanction should not be imposed by the trial court unless a Rule 37(a) order is in effect. *See LaClede Gas Co. v. G. W. Warnecke Corp.*, 604 F.2d 561, 565 (8th Cir. 1979); *Fisher v. Marubeni Cotton Corp.*, 526 F.2d 1338, 1341 (8th Cir. 1975). *See generally* 4A Moore's Federal Practice ¶ 37.03[2] (2d ed. 1980). The prerequisite of a Rule 37(a) order insures that the party failing to comply with discovery is given adequate notice and an opportunity to contest the discovery sought prior to the imposition of sanctions. Here, Falstaff was apprised of its failure to comply in March 1978, over a year and a half before sanctions were imposed.

■ We now turn to the issue of the propriety of the scope of the district court's discovery sanctions. A Rule 37(b) sanction striking affirmative defenses and counterclaims should only be imposed in strictly limited circumstances. The Supreme Court held in *Societe Internationale v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958), that Rule 37

> should not be construed to authorize dismissal of this complaint because of petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner. [Footnote omitted.]

The issue before this court is not whether we would, as an original matter, have imposed the sanctions, but rather, whether the district court abused its discretion in doing so. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976). The district court clearly found that Falstaff's failure to comply was due to a willful, bad-faith effort on the part of Falstaff to delay and obstruct the lawsuit. *Ante* at 1212–1213, *quoting* 84 F.R.D. at 418–19. The record fully supports these findings, as it demonstrates defendant's "flagrant bad faith" and "counsel's 'callous disregard' of their responsibilities." *National Hockey League*, 427 U.S. at 643, 96 S.Ct. at 2781. The district court's order of discovery sanctions against Falstaff is affirmed.

### III.

#### A.

■ With regard to the merits of the case, Falstaff first argues that the CBS plan does not fall within the coverage of ERISA. The CBS plan is a whole-life insurance plan for which Falstaff purchased insurance on approximately a dozen of its higher ranking executives. Under the terms of the plan, the named beneficiaries of a covered executive are to receive annuity income benefits upon the executive's death, with Falstaff recovering the annual premiums previously paid, with interest. The district court found the plan to be a funded employee welfare benefit plan un-

**1214**

der ERISA, 29 U.S.C. § 1002(1) (1976).[3] 491 F.2d at 1194–95.

Falstaff argues that the CBS plan is an excess benefit plan under 29 U.S.C. § 1002(36)[4] and that it is unfunded. Under 29 U.S.C. § 1003(b)(5), excess benefit plans, if they are unfunded, are exempt from ERISA coverage. The district court found the CBS plan to be funded, and therefore did not reach the issue of whether the plan was an excess benefit or welfare benefit plan. 491 F.Supp. at 1195.

We agree with the district court's conclusion that the plan was funded. Funding implies the existence of a *res* separate from the ordinary assets of the corporation. All whole-life insurance policies which have a cash value with premiums paid in part by corporate contributions to an insurance firm are funded plans. The employee may look to a *res* separate from the corporation in the event the contingency occurs which triggers the liability of the plan.

### B.

The major issue Falstaff argues on appeal is whether the district court erred in finding Kalmanovitz liable for tortious interference with the severance policy and CBS plans under Missouri common law. Falstaff contends that ERISA preempts a state common-law tortious interference with contract cause of action with regard to ERISA pension and welfare benefit plans.

■ ERISA preempts state laws to the extent that they relate to employee benefits which are not exempt from federal regulation. *See Alessi v. Raybestos-Manhattan, Inc.,* — U.S. —, —, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981). 29 U.S.C. § 1144 (1976) provides in pertinent part:

(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

\* \* \* \* \* \*

(c) For purposes of this section:
(1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

The Supreme Court recently has stated the criteria to be followed by a reviewing court in determining whether a state law is preempted by federal legislation. In *Chicago and North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981), the Court stated:

[W]hen Congress has chosen to legislate pursuant to its constitutional powers, then a court must find local law preempted by federal regulation whenever

---

**3.** 29 U.S.C. § 1002(1) provides, in relevant part:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship, or other training programs, or day care centers, scholarship funds, or prepaid legal services, \* \* \*.

**4.** 29 U.S.C. § 1002(36) provides:

The term "excess benefit plan" means a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 on plans to which that section applies, without regard to whether the plan is funded. To the extent that a separable part of a plan (as determined by the Secretary of Labor) maintained by an employer is maintained for such purpose, that part shall be treated as a separate plan which is an excess benefit plan.

the 'challenged state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."' *Perez v. Campbell*, 402 U.S. 637, 649 [91 S.Ct. 1704, 1711, 29 L.Ed.2d 233] (1971), quoting *Hines v. Davidowitz, supra* [312 U.S. 52] at 67–68 [61 S.Ct. 399, 404, 85 L.Ed. 581]. Making this determination 'is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict.' *Perez v. Campbell, supra* [402 U.S.], at 644 [91 S.Ct. at 1708]. And in deciding whether any conflict is present, a court's concern is necessarily with 'the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.' *San Diego Building Trades Council v. Garmon, supra* [359 U.S. 236], at 243 [79 S.Ct. 773, 778, 3 L.Ed.2d 775].

Congress has explicitly set forth the broad remedial policy of ERISA. 29 U.S.C. § 1001(b) (1976) provides:

It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

Congress therefore saw a need to set minimum, uniform national standards for employee benefit plans and to provide for uniform remedies in the enforcement of the plans. In doing so, Congress preempted all state laws which relate to employee benefit plans, not only state laws which directly attempt to regulate an area expressly covered by ERISA. *Wadsworth v. Whaland*, 562 F.2d 70, 77 (1st Cir. 1977) (Lay, J.), *cert. denied*, 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978). Congress "meant to establish pension plan regulation as exclusively a federal concern," limited only by the terms of ERISA itself. *Alessi v. Raybestos-Manhattan, Inc.,* —— U.S. at ——, 101 S.Ct. at 1906 (footnote omitted).

Although preemption is not lightly inferred, the broad scope of the substantive provisions of ERISA, combined with the explicit statement of federal preemption in section 1144, leads us to conclude that Congress intended to "occupy the field" of employee benefit plans. Conflicts between federal and state regulatory provisions may have one of two sources, "either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained [occupation of the field]." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). The first type of conflict involves a direct interference by the state law in its actual operation with the substantive policies underlying the federal legislation. The second type involves the congressional veto of state laws in areas within Congress's commerce clause powers. *See generally* L. Tribe, American Constitutional Law § 6–25 (1978). We conclude that Congress legislated an ouster of all state laws relating to employee benefit plans, given the "unambiguous congressional mandate to that effect" contained in section 1144. *Florida Lime & Avocado Growers, Inc.*, 373 U.S. at 147, 83 S.Ct. at 1219. *See generally* Hutchinson and Ifshin, *Federal Preemption of State Law Under the Employee Retirement Income Security Act of 1974*, 46 U.Chi.L.Rev. 23, 38–43 (1978).

■ The thrust of the former executives' argument against federal preemption of the state tortious interference with contract cause of action focuses on the lack of substantial damage such a cause of action would have on the overall purpose of ERISA. This argument, however, misses the point. If Congress has already provided a remedy for the violation of the former executives' benefit plans, then once Congress has expressed its intention to occupy the field, the state law is preempted, regardless of whether or not a conflict exists which

involves a direct interference by the state law with the substantive federal legislation. Here, Congress has provided a remedy for the wrong allegedly done the former executives by Kalmanovitz. 29 U.S.C. § 1140 (1976) provides, in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. * * * The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

Congress has preempted state law claims of tortious interference with employee benefit plans. The district court's judgment in favor of the former executives on this issue is reversed.

### C.

◼ The former executives argue an alternative basis for affirmance of the district court's award of punitive damages against Kalmanovitz in this case. The former executives contend that ERISA authorizes an award of punitive damages. The district court, on October 1, 1979, in ruling upon Falstaff's and Kalmanovitz's motions for partial summary judgment, held that punitive damages are not recoverable under ERISA. *Calhoun v. Falstaff Brewing Corp.*, 478 F.Supp. 357, 359 (E.D.Mo.1979). In the only other reported decisions on this question, two district courts have reached different conclusions. *Bittner v. Sadoff & Rudoy Industries*, 490 F.Supp. 534, 536 (E.D.Wis.1980) (not excluding punitive damages); *Hurn v. Retirement Fund Trust*, 424 F.Supp. 80, 82 (C.D.Cal.1976) (opposite). We do not think punitive damages are provided for in ERISA. Ordinarily punitive damages are not presumed; they are not the norm; and nowhere in ERISA are they

mentioned. If Congress had desired to provide for punitive damages, it could have easily so stated, as it has in other acts. However, we need not decide this issue, because we find that punitive damages are inappropriate in this case under either 29 U.S.C. § 1132(a) or § 1140. *Cf. International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 48–52, 99 S.Ct. 2121, 2125–26, 60 L.Ed.2d 698 (per se ban on punitive damages in union breach of fair representation suit). ERISA's section 1140 creates a federal statutory action for interference with employee benefit contracts. Congress recognized that the courts, in interpreting ERISA, would need to develop a body of federal common law to deal with the issues raised under the statute. *See Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1351 (8th Cir. 1980). We believe that, as a matter of federal common law, an award of punitive damages is inappropriate to a claim of interference with employee benefit plans.

The common-law tort of interference with contractual relations extends back to the Ordinance of Labourers, enacted in England in 1349. The statute provided a remedy to an employer, whose laborer had run off to another employer, against the new employer. The ordinance in effect provided the legal mechanism "by which a system of compulsory labor was introduced." W. Prosser, Law of Torts § 129, at 929 (4th ed. 1971). With this ominous beginning, the tort developed in the nineteenth century, to be used as a tool by employers to prevent the formation of unions. *See* Note, *Tortious Interference with Contractual Relations in the Nineteenth Century: The Transformation of Property, Contract, and Tort*, 93 Harv.L.Rev. 1510, 1532–33 (1980). The entire history of the tort has been to protect vested interests against the onslaught of free and open competition.

The economic significance of the tort would be limited, however, were it not for its damage provisions. Tortious interference with contract allows an injunctive remedy to be obtained in many cases. *See*

Prosser, *supra*, at 948. In addition, monetary damages can be obtained against the interferer rather than the breaching party. Finally, some courts have allowed the award of punitive damages. *See*, Annot., 26 A.L.R.2d 1227, 1274 (1952).

The advantage to suing under the tort, rather than on the contract, results from these damage provisions. The tort allows the party who has suffered a breach to, at times, enjoin the breach and recover damages in excess of those allowed under the common law of contract. The tort also allows recovery if the party breaching the contract is unable to satisfy a contract judgment. The tort, therefore, provides an additional weapon to the potential party subject to a contractual breach to prevent or deter the breach.

Whether punitive damages should be allowed for tortious interference with contractual relations is therefore dependent upon the extent to which contractual breaches should be deterred. *See Foust, supra*, 442 U.S. at 50–51, 99 S.Ct. at 2127. The common law of contract refuses to allow an award of punitive damages. This refusal has been explained in terms of economic efficiency. So long as the party subject to the breach is compensated to the extent of his loss, there is no reason to penalize the breaching party for refusing to perform his contractual obligations. The breach frees the latter's resources to be used in a more efficient manner elsewhere. *See* Barton, *The Economic Basis of Damages for Breach of Contract*, 1 J.Leg.Stud. 277, 282–91 (1972); Dobbs, *Tortious Interference With Contractual Relationships*, 34 Ark.L.Rev. 335, 360–61 (1981).

In the present case, the district court specifically found that "Kalmanovitz was acting at all times relevant to this litigation in what he perceived to be in the interest of Falstaff and not on his own behalf." 491 F.Supp. at 1193. To the extent that Kalmanovitz intentionally interfered with the former executives' benefit plans in violation of 29 U.S.C. § 1132 and § 1140, the former executives are entitled to their actual damages. So long as Kalmanovitz acted in what he believed were the interests of Falstaff, there is no reason to impose punitive damages against him unless under the same circumstances Falstaff should be held liable for punitive damages.

The district court found that "Kalmanovitz had no justification for directing Falstaff to breach the contract." *Id.* at 1198. Thereupon the court made its award of punitive damages. This was error, for neither Kalmanovitz nor Falstaff requires any justification to breach the contract. If Falstaff chose to breach, the former executives may contest the breach by bringing suit under ERISA. If they are correct in their interpretation of the contract, then they will succeed in their suit, as they in fact have done. There is simply no reason to use punitive damages as an additional deterrent to breach of the employee benefit plan by Falstaff. *See generally* Perlman, *Interference With Contractual and Other Economic Expenditures: A Clash of Tort and Contract Theory* 38–44 (tent. draft, University of Virginia School of Law 1981).

As noted below, attorney fees and interest are available under ERISA to compensate the former executives for any financial loss they have suffered from the litigation. We also note that Falstaff and Kalmanovitz have contended that the benefit plans were terminated because the former executives were terminated "for cause" which, under the plan's terms, relieved Falstaff of any obligation. We now turn to this issue.

**D.**

■ Falstaff next contends that the district court erred in finding that the former executives were not discharged for cause. *See* 491 F.Supp. at 1192–93. Falstaff charges that the former executives engaged in unethical, if not illegal, conduct, refused to properly follow directions, and were generally responsible for the company's poor financial picture at the time of the takeover. The district court found these contentions to be without merit. *Id.* Our review of the record leads us to conclude that the district court's factual findings on this issue were not "clearly erroneous." *See*

Fed.R.Civ.P. 52(a); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

### E.

◼ In their cross-appeal, Healy and Dependahl contend the district court erred in finding that their terminations from employment were not the result of a fraudulent misrepresentation by Kalmanovitz. Dependahl and Healy allege that Kalmanovitz represented that they would be retained after the takeover. The district court "found no such misrepresentations were made." 491 F.Supp. at 1199. The record supports this factual finding. "[T]here is no evidence that Kalmanovitz ever stated that plaintiffs would be retained after the takeover." *Id.* at 1191. We agree with this conclusion.

### F.

◼ Finally, the former executives assert that the district court erred in failing to render judgment on their implied claim of tortious interference with their employment contract. The former executives did not plead this cause of action in their complaint, nor did the district court make a finding on the issue. On appeal, the former executives contend that the issue was tried by the "implied consent of the parties" pursuant to Federal Rule of Civil Procedure 15(b).[5]

In *Gallon v. Lloyd-Thomas Co.*, 264 F.2d 821, 825 n.3 (8th Cir. 1959), we stated the relevant standards for a Rule 15(b) amendment after judgment:

"The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried; therefore, an amendment after judgment is not permissible which brings in some entirely extrinsic issue or changes the theory on which the case was actually tried, *even though there is evi-*

dence in the record—introduced as relevant to some other issue—which would support the amendment." (Emphasis supplied.) Vol. 3, Moore's Federal Practice § 15.13 at pp. 846–847.

Given Falstaff's record of contesting every issue in this case, it is difficult to imagine that they impliedly consented to anything the former executives raised at trial. In this case, the record reveals that neither Falstaff nor the former executives tried the action on the theory of tortious interference with the employment contracts. While Falstaff's post-trial brief did address some aspects of this issue as it related to the ERISA claims, this did not change "the theory on which the case was actually tried." *Id.* See also *St. Joe Minerals Corp. v. OSHRC*, 647 F.2d 840, 844 (8th Cir. 1981) (no amendment where a party would be denied fair opportunity to present evidence).

### IV.

The district court allowed prejudgment interest on the judgments obtained by the former executives resulting from Falstaff's ERISA violation pursuant to 29 U.S.C. § 1132. The trial court allowed an interest rate of nine percent as provided by Mo.Ann. Stat. § 408.020. Falstaff contends that the court erred in doing so, because up until September 28, 1979, Missouri law provided for a six percent statutory rate. We agree that the district court erred on this issue.

◼ The question of whether interest is to be allowed, and also the rate of computation, is a question of federal law where the cause of action arises from a federal statute. See *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 715, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945); *Perkins v. Standard Oil Co. of California*, 487 F.2d 672, 675 (9th Cir. 1973).

---

**5.** Federal Rule of Civil Procedure 15(b) provides in relevant part:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be

necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. * * *

 ERISA itself provides no express statutory authority for the award of prejudgment interest. Nor have we been able to find any reported case dealing with the award of prejudgment interest in an ERISA case. We therefore look for guidance to another area of federal labor law.

In *Hodgson v. American Can Co.*, 440 F.2d 916, 922 (8th Cir. 1971), where we considered the propriety of awarding interest on a compensatory award of back wages under the Fair Labor Standards Act, 29 U.S.C. § 217 (1970), the court relied on the following factors in awarding prejudgment interest:

> Section 17 contains no language providing for either liquidated damages or interest. In the absence of an unequivocal prohibition of interest, and where the statute imposes a money obligation, the power of the court to award interest is dependent on an appraisal of the congressional purpose of imposing the obligation and on the relative equities of the parties. *Rodgers v. United States*, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947). Clearly the award of back wages under the Fair Labor Standards Act is remedial in nature. 29 U.S.C. § 202(b), *Goldberg v. Wade Lahar Construction Co.*, 290 F.2d 408, 415 (8th Cir. 1961). The purpose of the award is to compensate the employees for the loss sustained because of the wrongful withholding of wages. While the good faith of the employer is one of many factors to be considered, "[t]o make such employees whole, the provision for the payment of interest for the time the back pay was wrongfully withheld from them is only equitable." *Marshfield Steel Co. v. N.L.R.B.*, 324 F.2d 333, 338 (8th Cir. 1963); *Shultz v. Wheaton Glass Co.*, supra, 319 F.Supp. [229] at 234 (D.N.J.1970). Both at law and equity, interest is allowed on money due. *Miller v. Robertson*, 266 U.S. 243, 256–258, 45 S.Ct. 73, [78–79] 69 L.Ed. 265 (1924).

From the inception of the discrimination, American Can was unjustly enriched and the female employees were damaged. During the entire period American Can has had the use of the money, and therefore equity and justice requires payment by way of interest for its use. The interest should be allowed from the dates of the underpayment.

We believe that these same considerations should be followed in an award of prejudgment interest with regard to an ERISA violation. The former executives have been denied their contractual severance benefits for a period of approximately four years before final judgment was rendered. Falstaff has continued to have the use of this money. Furthermore, the exact amount of the liability on the plans was never in issue. The only question was whether the employee benefit plan was binding in light of the "just cause" exception. Under these circumstances, an award of prejudgment interest is necessary in order that the plan participants obtain "appropriate equitable relief." 29 U.S.C. § 1132(a)(3)(B).

 A subsidiary question is the rate at which the award of interest should be computed. 28 U.S.C. § 1961 (1976) allows postjudgment interest on all civil judgments in federal court at the rate provided under state law.[6] We believe that section 1961 provides useful guidance in the area of prejudgment interest. In the interests of uniformity, we therefore hold that while federal law governs the issue of interest and its rate, state law should be incorporated in the determination of the proper rate to be allowed, once an independent finding is made concerning whether any prejudgment interest should be awarded.

In Missouri, interest is currently allowable on all written contracts, after demand

---

**6.** Title 28 U.S.C. § 1961 provides:

Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law.

for payment is made, at the rate of nine percent per annum. Mo.Ann.Stat. § 408.-020 (Vernon Supp.1981).[7] *See Knights of Columbus v. Wirtz*, 592 F.2d 466, 469 (8th Cir. 1979). Prior to September 28, 1979, the statutory rate was six percent per annum. Under a similar statute, post-judgment interest was raised on the same day from six to nine percent. Mo.Ann.Stat. § 408.040 (Vernon Supp.1981).[8] The Supreme Court of Missouri, in an *en banc* opinion, has held that this new rate should be applied prospectively only. *Senn v. Commerce-Manchester Bank*, 603 S.W.2d 551, 553–54 (Mo. 1980). We believe this holding would be followed with respect to section 408.020.

Prejudgment interest is to be computed at a rate of six percent per annum up until September 28, 1979, and at a rate of nine percent thereafter.

### V.

■ The final issue Falstaff raises on appeal is whether the district court abused its discretion in its award of attorney fees. The district court filed a written memorandum opinion awarding attorney fees to the former executives in the amount of $149,-175, and litigation expenses of $13,000. *Dependahl v. Falstaff Brewing Corp.*, 496 F.Supp. 215 (E.D.Mo.1980).

We have carefully studied the record, including the district court's written memorandum decision, the briefs, and the oral arguments of the parties to the appeal on this issue. We find no merit in Falstaff's arguments, and accordingly affirm the award of attorney fees on the basis of Judge Nangle's published memorandum decision. *See id.; Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1356 (8th Cir. 1980). It particularly appears that the award of attorney fees was appropriate and reasonable, as Kalmanovitz testified at trial that Falstaff had expended close to one million dollars in attorney fees in this case. The decision of the district court on this issue is affirmed, pursuant to Rule 14 of the Rules of this court.

Affirmed in part, reversed in part, and remanded for entry of a judgment in accordance with this opinion.

---

7. Mo.Ann.Stat. § 408.020 (Vernon Supp.1981) provides:

> Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made; for money recovered for the use of another, and retained without the owner's knowledge of the receipt, and for all other money due or to become due for the forebearance of payment whereof an express promise to pay interest has been made.

8. Mo.Ann.Stat. § 408.040 (Vernon Supp.1981) provides:

> Interest shall be allowed on all money due upon any judgment or order of any court from the day of rendering the same until satisfaction be made by payment, accord or sale of property; all such judgments and orders for money upon contracts bearing more than nine percent interest shall bear the same interest borne by such contracts, and all other judgments and orders for money shall bear nine percent per annum until satisfaction made as aforesaid.