Bruce D. **OVITZ**, Plaintiff,

v.

**JEFFERIES & COMPANY, INC.,** et al., **Defendants.**

No. 82 C 6651.

United States District Court, N.D. Illinois, E.D.

Oct. 28, 1983.

Mitchell H. Macknin, Bruce S. Sperling, Sperling, Slater & Spitz, Chicago, Ill., for plaintiff.

Richard C. Bollow, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Bruce D. Ovitz ("Ovitz") has filed a three-count Complaint against his former employer Jefferies & Company, Inc. ("Jefferies"), Jefferies' Employees' Profit Sharing Plan (the "Plan") and the Plan's administrators (the "Administrators"), challenging their refusal to pay Ovitz (1) "earnings" of his Profit Sharing Account (the "Account") under the Plan from January 1,

1981 to the date the Account was paid him [1] plus a pro rata share of Jefferies' 1981 profit sharing contributions to the Plan or (2) alternatively a share of Jefferies' profits in some manner other than through the Plan. This controversy stems from Ovitz having left his job with Jefferies shortly before the end of the Plan's accounting year (December 31, 1981). Had Ovitz remained with the company through the end of the year, it is undisputed he would have been entitled to participate in both the Plan asset revaluation and the 1981 contributions to the Plan. Because he left the Company in December rather than the following January, Jefferies and Administrators, allegedly pursuant to the terms of the Plan, have declined to award Ovitz any of that amount.

Complaint Count I alleges Jefferies' and Administrators' failure to pay the contested funds to Ovitz constitutes a violation of the Plan and thus is contrary to both the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1101–45, and the common law. Complaint Count II alleges Administrators' behavior is a breach of fiduciary duty, again contrary to both ERISA and the common law. Complaint Count III alleges a contract between Ovitz and Jefferies apart from the terms of the Plan, entitling Ovitz to profits of Jefferies whether or not they would be distributed pursuant to the Plan. Counts I and II are therefore based on the terms of the Plan, while Count III is not.

Defendants now move for summary judgment under Fed.R.Civ.P. ("Rule") 56. Whatever the relative plausibility of the positions respectively advanced by the parties as to the Plan's meaning, summary disposition of Ovitz' claims is not available to defendants.

### Counts I and II—Common-Law Theories

Defendants' motion for summary judgment attacks the common-law theories of

Counts I and II on the ground ERISA has preempted them. Defendants contend ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides a cause of action for breach of a contractual pension plan agreement while ERISA §§ 401–14, 29 U.S.C. §§ 1101–14, provide a remedy for breach of fiduciary duty pursuant to a pension plan. As a result defendants assert there is no longer any state cause of action for those claims. Because that argument is sound, this Court dismisses Ovitz' claims the Plan has been violated to the extent such claims rest on state common law.

When Congress passed ERISA its intent (with certain exceptions not relevant here) was to sweep aside all related state law, whether consistent or inconsistent. ERISA § 514, 29 U.S.C. § 1144, expresses that congressional intent to displace state law, including common law as well as legislation. *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294, 1298–1300 (N.D.Cal. 1977), *aff'd per curiam on the District Court's opinion*, 571 F.2d 502, 504 (9th Cir.1978), exhaustively reviewed the legislative history of Section 514 and concluded (*id.* at 1300) "that Congress carefully considered the question of preemption, including the feasibility of enacting a more limited preemption provision, and that Congress ultimately enacted Section 514(a) with the express purpose of summarily preempting state regulation of ERISA-covered employee benefit plans." Thus in enacting ERISA Congress "meant to establish pension plan regulation as exclusively a federal concern." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981) (footnote omitted).

Ovitz poses two counter-arguments. Neither is persuasive here.

First, Ovitz claims there is no preemption if the cause of action at issue only

---

1. More accurately, though Ovitz consistently refers to a pro rata share of "earnings of the Plan" (Pl.Mem. 2, 3, 7, 9, 14, 15), Plan § 5.2 (as is typical of profit sharing plans) rather provides for a periodic revaluation of Plan assets in fair market value terms. Thus a participating employee shares in both (a) net income (or losses) and (b) asset appreciation or depreciation. This opinion will refer to sharing in "asset revaluation," thus covering both items.

indirectly affects the legislative scheme embodied in ERISA. In our Circuit, state law that purports to govern the "terms and conditions" of pension plans generally is preempted by ERISA unless it "relates to such plans 'only in the most remote and peripheral manner.'" *Bucyrus-Erie Co. v. Department of Industry, Labor & Human Relations,* 599 F.2d 205, 209–10 (7th Cir.1979), quoting *AT & T v. Merry,* 592 F.2d 118, 121 (2d Cir.1979). But Illinois common law, to the extent it would attempt to remedy breaches of pension plan agreements or breaches of duty by pension plan administrators, would govern the terms and conditions of pension plans in more than a remote and peripheral manner. *See Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1214–16 (8th Cir.1981).

Second, Ovitz argues there is no preemption if state law promotes the goals of ERISA rather than hinders them. That view however has long been discredited. See *id.* at 1215, finding that such an argument "misses the point." Congress can choose to regulate a field by limiting the number of remedies as well as by expanding them, and that is precisely what it has done here.

■ Thus it is clear Complaint Counts I and II must be based entirely on federal law. This opinion turns then to that inquiry.

### Counts I and II—ERISA Theory

In the federal law context, a preliminary question is the standard of conduct to which ERISA holds Administrators. Although Ovitz properly points out ERISA requires plan administrators to act with prudence and care, 29 U.S.C. § 1104(a)(1)(B), federal courts repeatedly have held they will not reverse a decision of pension plan administrators acting in good faith unless their decision is "arbitrary and capricious in light of the lan-

guage of the Plan." *Wardle v. Central States, Southeast & Southwest Areas Pension Fund,* 627 F.2d 820, 824 (7th Cir. 1980).[2]

■ Ovitz' principal contention as to the behavior of the Administrators is that in failing to award him a share of the Plan asset revaluation and the 1981 contribution, they have acted contrary to the clear provisions of the Plan. Ovitz must prove such behavior was "arbitrary and capricious" to be entitled to relief. Ovitz apparently concedes that had his departure from Jefferies before year-end been coupled with segregation of his profit sharing account, he would not be entitled to a share of either the revaluation or the current year's contribution. However he contends that because his funds were still commingled with the funds of current employees at year-end, Plan § 5.3 necessarily entitles him to the shares in question:

5.3 *Segregation of Participant's Accounts Upon Severance.* Following a Participant's retirement, death, permanent disability, or other termination of employment, such Participant's account if not previously disbursed may be segregated from the Trust Fund in an interest bearing account and he will no longer share in the income or losses or increase or decrease in fair market value of the Trust Fund, or the allocations of Company contributions or the allocation of forfeitures hereunder.

■ It might perhaps be argued that Section 5.3 (viewed in isolation) establishes the moment a Participant's funds are segregated as the moment at which his or her various rights terminate under the Plan. Defendants however cite Plan §§ 3.2, 5.1 and 5.2, which they say reflect an intent that the termination of employment and not the segregation of funds should constitute the moment at which a Participant's rights to further participation terminate.

**2.** Both plaintiff and defendants quote the "arbitrary and capricious" language from *Wardle.* That standard has been characterized by another Court of Appeals as having been chosen by the "clear weight of federal authority." *Den-* *nard v. Richards Group, Inc.,* 681 F.2d 306, 313 (5th Cir.1982), quoting *Bayles v. Central States, Southeast & Southwest Areas Pension Fund,* 602 F.2d 97, 99 (5th Cir.1979).

In the interests of simplicity, only the relevant portions of those Sections are quoted:

> 3.2 *Cessation of Participation.* A Participant whose employment by the Company terminates shall cease to be a Participant in this Plan....[3]

\*    \*    \*    \*    \*    \*

> 5.1 *Profit Sharing Account.* The Administrative Committee shall open and maintain a Profit Sharing Account for each Participant upon commencement of his participation in the Plan. Each Participant's Profit Sharing Account shall be credited (or charged) annually with the amount allocated to it pursuant to subsection 5.1(a) and (b) below, and the Administrative Committee shall notify each Participant accordingly:
>
> (a) The Company's annual contribution made under Article IV for each Fiscal Year ending on an Anniversary Date shall be allocated among the Profit Sharing Accounts of Participants who are in the employ of the Company on said Anniversary Date....
>
> (b) Amounts forfeited under the provisions of Article VII shall be allocated, on the Anniversary Date coinciding with or next following the date on which such amounts are forfeited, among the Profit Sharing Accounts of Participants who are in the employ of the Company on such Anniversary Date, provided, however, that no allocation of a forfeited amount shall be made to the Profit Sharing Account of a Participant who was not employed by the Company on the date of termination of employment of the Participant with respect to whom such amount was forfeited....
>
> 5.2 *Allocation of Plan Earnings or Losses.* Not less frequently than annually (and not more frequently than monthly), as of a valuation date determined by the Administrative Committee, the Administrative Committee shall separately determine or cause to be determined, the fair market value of the net assets of each Investment Fund (and any unallocated funds) held under the Trust fund, excluding the Company's contributions to the Plan for the period since the last valuation date. Any increase or decrease in the fair market value of such assets since the most recent prior valuation date shall be allocated among the accounts of Participants who then have an interest in such Investment Fund (and any unallocated fund). Such allocation to any account of any such Participant shall be in the proportion that such Participant's account balance bears to all other account balances in said Investment Fund (or unallocated fund) after the allocation of forfeitures set forth in Section 5.1(b), but before the allocation of Company contributions with respect to the period since the most recent prior valuation date.

Defendants contend Section 5.3 deals with two events, one of which (the possible segregation of funds) "may" and the other of which (cessation of further Plan participation) "will" take place following termination of employment. In their view Section 5.3 does not *condition* the termination of Plan participation on prior segregation.

---

**3.** It may be noted there is some possible inconsistency in the use of "Participant" throughout the Plan. Definitional Section 2.15 limits that term to *present* employees, as does eligibility Section 3.1 (which specifies when an employee first becomes a "Participant"). In the same way Section 2.3 refers both to a "Participant" and to a "former Participant," conforming to Section 3.2 usage under which only a *present* employee may be a "Participant." But Section 5.3 continues to refer to a "Participant's account" rather than a "former Participant's account" in speaking of the situation following such Participant's

termination of employment (and compare like usage in (for example) Plan §§ 7.3, 7.4, 8.2, 8.3, 8.4 and 9.1). Anyone who has drafted a profit sharing plan, with its complex interacting provisions, knows the difficulty of making sure it employs uniform terminology throughout. Unfortunately in this case the lack of total precision in that respect has fostered the present dispute between the parties—but that is not necessarily the same as denoting the kind of ambiguity that must be construed against defendants or that necessarily upholds Ovitz' position.

Admittedly it is conceivable Section 5.3 might be read differently, as describing a three-step sequence of events: termination of employment, segregation and finally cessation of participation rights under the Plan. To read Section 5.3 in that manner, however, would be to create an unnecessary ambiguity in the Plan. Without reference to Section 5.3 the other quoted sections (Plan §§ 3.2, 5.1 and 5.2) are entirely clear in providing an employee's Plan participation rights cease as soon as the employee ceases to be employed by Jefferies. If the Section 5.3 possibility of segregation of an employee's account is read literally— as something that "may" but need not occur after termination of his or her employment[4]—what Ovitz argues is the critical last clause of Section 5.3 is no worse than repetitive, conforming to the other Plan provisions under which employees' Plan participation rights cease upon termination of employment.

That appears to leave the issues in this posture at this point of the analysis, assuming the consistency of Plan administration referred to in Owens Aff. ¶ 12:

1. Administrators could not possibly be said to be "arbitrary and capricious" if they decided Ovitz had no right to share in Jefferies' 1981 Plan contribution or in 1981 forfeitures. Plan §§ 5.1(a) and 5.1(b) specifically and clearly limit such sharing to "Participants *who are in the employ of the Company* on [the] Anniversary Date [December 31, 1981] ...." Ovitz was not. Nothing in Plan § 5.3 would warrant this Court's flouting of such unambiguous language if the Administrators did not do so.

2. Ovitz' claim to a share in the "increase or decrease in the fair market value of [the Investment Fund] assets since the most recent prior valuation date

[December 30, 1980]" stands on a somewhat less plain footing, though here too defendants would appear to have the better of the argument. Plan § 5.2 accords such sharing to "Participants who then [i.e., December 31, 1981] have an interest in such Investment Fund." Literally Ovitz was not then a "Participant," for he was not then an employee. But the variations in usage adverted to at n. 3 preclude that fact from being wholly determinative. Thus it is necessary to examine whether a terminated employee continues to "have an interest in such Investment Fund" until his or her account is segregated as permitted under Plan § 5.3.

Only the last-mentioned question requires further scrutiny.

On that score the evidence adduced by the parties is not such as to permit summary judgment. Defendants point to Paragraph 5 of the Summary Plan Description given to all Jefferies employees (including Ovitz):

Because a revaluation of accounts is made only periodically, an individual Participant's account, when distributed, generally will not reflect investment results since the last Valuation Date. In other words, the value of a Participant's account for distribution or other purposes generally will be the value of the account as of the last preceding Valuation Date. When a Participant's employment terminates, his account will not share in the investment results of the Trust Fund for the period since the last valuation. However, if such terminated Participant's account is not to be distributed upon termination, it may be placed in an interest bearing account in a bank or savings and loan association and in

---

**4.** Ovitz is (unsurprisingly) silent about Section 5.3's use of "may" in referring to the segregation of an employee's account after termination of employment. Plainly the Administrators are not duty-bound to segregate *every* terminated employee's account. Indeed Plan § 7.3(b) mandates such segregation only if a Participant does not elect lump-sum distribution of his or her vested interest (a logical distinction). Ovitz' sequential reading of Section 5.3 would literally apply only to accounts that were segregated in fact (and of course Ovitz himself elected lump-sum distribution, so that segregation of his account was not required under the Plan). Such a reading—wholly aleatory in its operation—would lead to bizarre results, so that defendants' construction is again demonstrated to be more logical.

such case will earn the interest rate applicable to that bank or savings and loan association account.

That is surely persuasive, but it is not necessarily controlling, for a wrongful uniformity of plan interpretation may itself be "arbitrary and capricious." *Dennard,* 681 F.2d at 315; *Morgan v. Mullins,* 643 F.2d 1320, 1324 n. 4 (8th Cir.1981). And Owens' statement as to the consistent administration of the Plan[5] may be undercut by Ovitz' Aff. ¶ 7, which says the other two Administrators were of the opinion he *was* entitled to the disputed Plan benefits. In sum defendants may well prevail on an expanded presentation of all the facts, but they are not now home free as a matter of law.

Because the parties will have the further opportunity to elaborate their proof (and their legal arguments as well), a few comments on other issues raised in their briefs may be in order. Though added facts may cast a different light on things, Ovitz' arguments about (1) the absence of Administrators' minutes and (2) the fact he was paid more interest than defendants' reading of the Plan would mandate seem no better than makeweight (if that). And his contention he had a right to have the Plan revaluation and allocation made monthly rather than annually (Pl. Mem. 15–16) is not even specious.

As for the issue of Plan administration, Ovitz may have difficulty in asserting both that two of the three Administrators supported his position and that an attempt to exhaust his administrative remedies under Plan § 11.3 would have been futile.[6] Even if Ovitz were to make that passage between Scylla and Charybdis, if the construction now advanced by defendants is not "arbitrary and capricious" Ovitz may be entitled only to a current determination of his rights by the Administrators—not necessarily to a money award conforming to Ovitz' own reading of Plan §§ 5.2 and 5.3.

Finally Ovitz argues Jefferies is liable for an ERISA violation because it demoted him in a deliberate attempt to escape its liabilities to him under the Plan. Defendants urge strongly this is a new theory of liability, and it may well be.[7] Complaint ¶ 11 alleges only that Ovitz was demoted and then as a result left the company. That was hardly enough, even under the liberal notice pleading approach of the Rules, to have put defendants on notice of Ovitz' "constructive discharge" theory—first advanced in his responsive memorandum.

Understandably, then, defendants' response to the constructive discharge assertion was to concede all facts upon which Ovitz relies and to argue it is therefore impossible for disputed issues of material fact to remain. They urge this Court to decide as a matter of law whether Ovitz was constructively discharged.

That would be premature on the limited evidence now before this Court. Whether a reasonable person in Ovitz' position would have resigned as a result of his demotion, and whether defendants deliberately put Ovitz in that position "for the purpose of interfering with the attainment of any right to which [he] may become entitled under the plan" (29 U.S.C. § 1140),[8] must be determined from the totality of the circumstances.

5. Owen Aff. ¶ 12 says "no former participant whose employment was terminated prior to the last date of a given Plan Year [December 31] has received a pro rata share of ... the benefit (or detriment) of investment results during that Plan Year."

6. This Court expresses no opinion on the non-exhaustion issue or its consequences under ERISA.

7. This Court's December 20, 1982 memorandum opinion and order held Ovitz entitled to a jury trial because he was arguing a simple contract action that presupposed he was absolutely entitled to a set dollar amount as relief. That reasoning was not intended to apply to a "constructive discharge" theory and will have to be reevaluated before trial.

8. Defendants argue (Def.R.Mem. 15 n. *) that as a matter of law no "aggravated situation" exists from which a constructive discharge can be inferred. *See Nolan v. Cleland,* 686 F.2d 806, 813 (9th Cir.1982). *Nolan* defines an "aggravated situation" as one that arises from not one

### Count III

 Ovitz' final theory is that he has a contractual right to receive a share of Jefferies' profits. That claim too withstands defendants' motion for summary judgment, though it is not at all clear it gives Ovitz anything more than Counts I and II would.

Defendants initially contend Count III has been preempted by ERISA. However, both cases they cite for that proposition dealt with alleged disruption of pension benefits. *Dependahl*, 653 F.2d at 1711–12; *Witkowski v. St. Anne's Hospital*, 113 Ill. App.3d 745, 69 Ill.Dec. 581, 447 N.E.2d 1016 (1st Dist.1983) (constructive discharge). As Ovitz correctly points out, his third claim is for breach of an employment contract, not breach of a pension plan. And ERISA does not provide a statutory remedy for breach of employment contracts.

Defendants then urge the poverty of Ovitz' "contract" arguments, citing various admissions made by Ovitz during his deposition as well as his affidavit's lack of precision as to just what was promised him. It does seem very possible the only promise he can prove is one to receive a share of the profits pursuant to the Plan or, if not, one that may be too vague for enforcement.[9] But those and other questions are best left to await proof.

### Conclusion

Complaint Counts I and II are dismissed insofar as they rely on state law. In all other respects defendants' summary judgment motion is denied.

---

but a series of discriminatory acts against the plaintiff. Demotion, however, is unlike the single discriminatory act considered by the court in *Nolan* (failure to grant leave without pay). Demotion creates an ongoing change of status, and this Court holds a demotion could conceivably be sufficiently egregious to trigger a constructive discharge.

**9.** Defendants also assert (Def.R.Mem. 12 n. *) a promise beyond the Plan might be unlawful (and hence unenforceable) as discriminatory. That is both too "iffy" and premature to merit discussion now.