Richard REID, Plaintiff,

v.

**PRUDENTIAL INSURANCE COMPANY OF AMERICA & Safeco Life Insurance Company, Defendants.**

No. 89–0065–CIV–ORL–18.

United States District Court, M.D. Florida, Orlando Division.

Nov. 30, 1990.

David A. May, Bogin, Munns & Munns, Orlando, Fla., for plaintiff.

Sutton G. Hilyard, Jr., Eubanks, Hilyard, Rumbley, Meier & Lengauer, Orlando, Fla., for defendant Prudential Ins.

E. Givens Goodspeed, Giles, Hedrick & Robinson, P.A., Orlando, Fla., for defendant Safeco Life Ins.

## ORDER

G. KENDALL SHARP, District Judge.

Plaintiff brought this lawsuit for employee benefits under the Employee Retirement Income Security Act (ERISA). Shortly before the trial began, Prudential Insurance Company settled its dispute with plaintiff. Safeco Life Insurance Company was unable to come to terms with plaintiff, and it remained the sole defendant in this action. The issue in this lawsuit is whether plaintiff had practical and beneficial sight in his right eye before it was surgically removed. This court concludes that he did and rules in his favor. In accordance with Federal Rule of Civil Procedure 52(a), the court enters its order based on the evidence, testimony, and exhibits presented during this non-jury trial.

### I. Findings of Fact

The Lockheed Space Operations Corporation employs plaintiff as a space shuttle mechanic. Plaintiff is required to set up and check equipment on the shuttle before each launch. Lockheed provides him with a group benefit plan that defendant underwrites. According to the plan, plaintiff is insured for the principal sum of $27,500.00 for the "entire and irrevocable loss of sight." In late September 1987, plaintiff had his right eye surgically removed and made a claim on the insurance policy. Defendant refused to make payment, contending that plaintiff lost the entire and irrevocable sight in his right eye years before the surgery.

In this case, eyesight is defined as practical and beneficial vision. Eyesight is measured in four ways. The best eyesight is eye chart vision, which is measured by a standard eye chart. If a person's eye chart vision is 20/400, he is considered legally blind. Eyesight worse than 20/400 is measured by having the person count fingers held two to four feet away from his face. If he cannot count the fingers, his sight is measured by whether he can see a hand waving in front of his face at a distance of one to two feet. If the person cannot detect the hand motion, his vision is then checked for light perception. A small light is shined into the four quadrants of the person's eye to determine whether he can detect the light. If he cannot determine whether the light is on or off, he is considered totally blind.

Plaintiff claimed that three accidents led to the loss of his right eye. In December 1986, while working for Lockheed, he accidentally splashed an organic solvent, methyl ethyl ketone, into his right eye while he was cleaning fittings. The chemical irritated his eye, which became red and teary. In January 1987, plaintiff again accidentally splashed the organic solvent into the same eye. Plaintiff further injured his right eye in January while he was grading land with a tractor. The tractor became stuck on a tree root. When plaintiff turned around to see what was wrong, the root sprang up and hit him on the right side of his face. The root knocked off his eyeglasses and threw dirt into his eye. The blow made his right eye tear, gave him headaches, and caused him to become dizzy. The impact left a red mark, which remained for two weeks, under his right eye. Soon after the tractor accident, plaintiff noticed a loss in depth perception in his right eye, and he later experienced a total loss of vision in the eye.

After these accidents, Dr. James Bolling diagnosed plaintiff as having a detached retina and a dense cataract in his right eye. When Dr. Bolling saw plaintiff, he had only light perception vision without projection in his right eye, which means plaintiff could detect light, but not the direction from which it emanated; light perception vision is not considered practical and beneficial eyesight. Dr. Bolling did not recommend that plaintiff pursue treatment for the detached retina because the cataract would have complicated the surgery and plaintiff's vision would not have improved. Dr. James Demming also saw plaintiff after the accidents and did not recommend surgery to plaintiff's eye for the same reasons. Since his birth, plaintiff's vision in his right eye had been poor as a result of genetic optic nerve atrophy—damage to the optic nerve that permanently limited the vision in the eye.

Shortly after visiting Dr. Bolling and Dr. Demming, plaintiff went to Dr. Durham Barnes, who was plaintiff's expert witness at trial. Dr. Barnes confirmed that plaintiff had a detached retina and a cataract in his right eye, which impaired plaintiff's vision. In Dr. Barnes's opinion, the tear to the retina was fresh and was caused by the blow to plaintiff's face. He did not think the chemical splashes caused the retinal detachment. Dr. Barnes offered plaintiff two options with respect to his right eye: Plaintiff could choose not to have surgery and either lose the eye or go blind, or he could elect to have surgery to repair the retina and remove the cataract at the same time. Plaintiff chose to have the surgery because he had a fifty-five percent chance of saving the eye and regaining his former vision. In late January 1987, Dr. Barnes performed the operation. Plaintiff felt fine after the procedure, but in early February the retina again became detached and the eye hemorrhaged. In late February, Dr. Barnes performed another surgery to reattach the retina and stop the bleeding. The operation failed, and plaintiff lost all vision in his right eye. In late September 1987, Dr. Bolling removed the eye.

At trial, defendant presented an expert witness, Dr. Jack Parker, who reviewed plaintiff's medical records from 1980 until the present. According to those records, in June 1980 plaintiff had finger counting vision in his right eye. The records also indicate that from July 1980 until August 1985, plaintiff only had hand motion vision in his right eye, which was not considered practical and beneficial sight. In addition, the records state that plaintiff told Dr. James Clower, his treating physician from 1980 until 1985, that he had been blind in his right eye for a long time; some of the other medical records contain the same conclusion. Dr. Parker did not think plaintiff's records were erroneous. Moreover, although the doctor agreed that the blow to plaintiff's face may have caused the retinal detachment, in his opinion the root would not have severed the retina unless it had hit plaintiff directly on the eye, injured his brain, and caused him to lose consciousness.

Notwithstanding Dr. Parker's testimony, plaintiff maintained that he had practical and beneficial use of his right eye before it was removed. For example, in 1985 plaintiff had cataract surgery on his left eye. Plaintiff's left eye was either bandaged or patched, for about four weeks after the surgery. During that time, plaintiff cooked for himself, cleaned his house, watered his yard, walked without assistance, and generally cared for himself, which included attending to his left eye during the day. While his left eye was covered, he drove his automobile to his daughter's house, to a doughnut shop, and to and from work, a round trip distance of ninety miles. Eyewitnesses saw him drive with the white patch over his left eye. Plaintiff drove normally.

In addition, plaintiff was able to do his job with the use of only his right eye. Plaintiff handled small fittings, read manuals, gauges, and part numbers, and connected and disconnected hoses to and from the space shuttle. To affix the correct hose to the proper port, plaintiff had to read letters, a quarter inch in height, on the hose and on the respective port. According to one witness, had plaintiff incorrectly connected the hoses, the shuttle

would have exploded. Eyewitnesses saw plaintiff perform the tasks of his job while he was only able to use his right eye. Plaintiff testified that between 1985 and the time of the three mishaps, the vision in his right eye remained unchanged.

## II. Conclusions of Law

### A. Preemption Under ERISA

■ Plaintiff seeks recovery of benefits and damages under an employee group health insurance program governed by the Employee Retirement Income Security Act (ERISA). 29 U.S.C. §§ 1001–1461 (1988); *see Comprehensive Care Corp. v. Doughtry*, 682 F.Supp. 516, 517 (S.D.Fla.1988) ("Congress specifically intended *all* group health insurance programs to be governed exclusively by ERISA") (emphasis in the original). Plaintiff's state law claims of breach of contract and breach of fiduciary duty "relate to [his] employee benefit plan" and, therefore, are preempted by ERISA. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62–63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45–48, 107 S.Ct. 1549, 1551–53, 95 L.Ed.2d 39 (1987); 29 U.S.C. § 1144(a). Because "ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans," federal courts must fashion a federal common law to regulate such lawsuits. *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1501 (9th Cir.1985). In so doing, a federal court may borrow "from state law where appropriate, and [may be] guided by the policies expressed in ERISA and other federal labor laws...." *Id.* at 1502; *accord Nachwalter v. Christie*, 805 F.2d 956, 959–60 (11th Cir.1986).

### B. Quality of Vision

■ Although plaintiff experienced the entire and irrevocable loss of sight in his right eye after it was removed, the question before this court is whether he had sight in his right eye before its removal. Because ERISA offers no definition of sight, the court must turn to state law. In the context of this case, eyesight is vision that has practical and beneficial use. *Mas-sachusetts Indem. & Life Ins. Co. v. Schupper*, 301 So.2d 789, 791 (Fla.Dist.Ct. App.1974) ("the standard to be applied in deciding whether plaintiff is entitled to recovery under the subject policy is whether or not plaintiff has lost the practical and/or beneficial use of his eyes"), *cert. denied*, 312 So.2d 743 (Fla.1975).

■ Based on the evidence presented at trial, this court concludes that plaintiff had practical and beneficial sight in his right eye before it was surgically removed. In 1985, plaintiff functioned well with just the use of his right eye. While his left eye was covered, plaintiff cared for himself, drove his automobile, walked without assistance, and worked on the space shuttle. The testimony of plaintiff and of the eyewitnesses who saw plaintiff work and drive while his left eye was covered outweighs Dr. Parker's testimony, based on plaintiff's medical records, that plaintiff did not have practical and beneficial vision in his right eye before the three accidents. *See Laird v. United States*, 556 F.2d 1224, 1240–41 (5th Cir.1977) (a court is not bound by the opinion testimony of an expert and may weigh it along with the other evidence), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978); *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir.1970) ("the trier of fact is not bound by expert testimony and may substitute its own common-sense judgment for that of the experts"), *cert. denied*, 404 U.S. 823, 92 S.Ct. 44, 30 L.Ed.2d 50 (1971). Furthermore, plaintiff's ability to function with only his right eye contradicts the conclusions of the treating physicians, as represented in the medical records, that he did not have practical and beneficial vision in his right eye. Plaintiff's ability to behave in the manner in which he did while his left eye was covered demonstrates to the court that some of the statements in plaintiff's medical records are less than accurate.

The court's conclusion that plaintiff had practical and beneficial vision in his right eye is also supported by plaintiff noticing a loss in depth perception and a total loss of vision in his right eye after the three accidents. Plaintiff's realization that his vision

had deteriorated indicates that he had sight in the eye; otherwise, he would not have noticed a difference in his ability to see. Likewise, had plaintiff been without practical and beneficial vision before the chemical and root accidents, he would not have sought the complicated surgery of having his retina repaired and cataract removed after the accidents. Both Dr. Barnes and Dr. Parker stated that the operation would have only restored plaintiff's vision, but would not have improved it.

Because laymen use the term "blind" loosely, for example, in the expression, "the umpire is as blind as a bat," the court places little weight on plaintiff's alleged comment in 1980 to Dr. Clower that he had been blind in his right eye for some time. When asked at trial about his comment to Dr. Clower, plaintiff responded that it was not his statement, but the doctor's. Plaintiff's alleged statement to Dr. Clower also conflicts with plaintiff's testimony that from 1985 until the time of the three accidents the vision in his right eye remained unchanged; it also contradicts plaintiff's statement to Dr. Bolling in late January 1987 that before the three accidents he had vision in his right eye.

■ The experts agreed that a detached retina may occur for many reasons but, in this case, it did not occur from the chemical splashes. In regard to the blow to plaintiff's face, Dr. Parker thought the retina would have detached only if plaintiff were hit directly on his eye, suffered brain damage, and became unconscious, none of which took place. In Dr. Barnes's opinion, however, the blow to the face caused the injury to plaintiff's eye and the detached retina led to his loss in vision.

"It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury. While he may not arbitrarily fail to consider such testimony, he is not bound to accept it. In the ultimate analysis, the trier of fact is the final arbiter as between experts whose opinions may differ as to precise causes [of injury]...." *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir.1977); *accord Increase Minority*

*Part. by Affirm. Change Today v. Firestone*, 893 F.2d 1189, 1195 (11th Cir.) (the trial court has discretion in determining the competency of an expert and the weight given to his testimony), *cert. denied,—— U.S. ——*, 111 S.Ct. 133, 112 L.Ed.2d 100 (1990); *Ludlow Corp. v. Textile Rubber & Chem. Co.*, 636 F.2d 1057, 1060 (5th Cir. 1981) ("When it sits without a jury, the trial court's discretion is ... the sole determinant of the weight to be given expert testimony"). The court agrees with Dr. Barnes's conclusion regarding the injury to plaintiff's eye. He examined plaintiff soon after the accident, whereas Dr. Parker only examined plaintiff's medical records. Dr. Barnes stated that the tear in the retina was fresh when he saw plaintiff in late January 1987, shortly after the three accidents. The fresh tear indicates to the court that a recent trauma caused the detached retina.

### C. Prejudgment Interest Under ERISA

■ In plaintiff's second amended complaint, he requested prejudgment interest at the legal rate in Florida of twelve percent per annum. *See West v. Sunbelt Enters.*, 530 So.2d 433, 436 (Fla.Dist.Ct. App.1988); Fla.Stat. § 55.03(1) (1989). An award of prejudgment interest for the prevailing party in an ERISA lawsuit is a matter of court discretion. *Moon v. American Home Assur. Co.*, 888 F.2d 86, 89–90 (11th Cir.1989). "[T]he rate of computation, is a question of federal law where the cause of action arises from a federal statute." *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1218 (8th Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384, *cert. denied*, 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981). Prejudgment interest should be awarded to compensate the prevailing party for not having the use of the money awarded as damages, but it should not be used to punish the losing party. *See Osterneck v. E.T. Barwick Indus.*, 825 F.2d 1521, 1536 (11th Cir.1987), *aff'd sub nom. Osterneck v. Ernst & Whinney*, 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989); *Short v. Central States, S.E. & S.W. Areas Pension Fund*, 729 F.2d 567, 576 (8th Cir.1984). As

such, the court awards plaintiff prejudgment interest at the legal rate calculated pursuant to 28 U.S.C. § 1961(a) (1988), which the court deems an appropriate rate to compensate plaintiff fully, without punishing defendant. *See Blanton v. Anzalone*, 760 F.2d 989, 992–93 (9th Cir.1985); *Dependahl*, 653 F.2d at 1219.

### III. Conclusion

Plaintiff had practical and beneficial use of his right eye before it was injured in the tree root accident. The removal of his eye constitutes the "entire and irrevocable loss of sight" as required by the terms of the insurance policy between plaintiff and defendant. Therefore, defendant shall compensate plaintiff for his loss of sight. Accordingly, the clerk of the court shall enter judgment for plaintiff and against defendant for the policy amount of $27,500.00, plus prejudgment interest at the rate calculated in accordance with 28 U.S.C. § 1961(a).

It is SO ORDERED.