## In re BICOASTAL CORPORATION d/b/a Simuflite f/k/a The Singer Company, Debtor.

**Bankruptcy No. 89–8191–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 19, 1995.

Harley E. Riedel, Stichter, Riedel, Blain & Prosser, Tampa, FL, David Potter, Oppenheimer, Wolff & Donnelly, St. Paul, MN, Richard E. Berman, Ruden, Barnett, McClosky, Smith Schuster & Russell, P.A., Fort Lauderdale, FL, for debtor.

Richard M. Blau, Holland & Knight, Tampa, FL, for applicant.

William Goldman, Brown & Wood, New York City, for creditors committee.

## ORDER ON DEBTOR'S OBJECTION TO ADMINISTRATIVE CLAIM OF LORAL (QUEEN'S HARBOR)

ALEXANDER L. PASKAY, Chief Judge.

THIS IS the next phase of litigation between Loral Librascope Pension Plan (Loral) and Bicoastal Corporation, d/b/a Simuflite, f/k/a The Singer Company (Debtor). The present matter under consideration in this confirmed Chapter 11 case is an Amended Application filed by Loral for administrative expense and an Objection filed by the Debtor to the Application. In its claim, Loral contends it is entitled to an allowance as a cost of administration in the approximate amount of $3.2 million which represent the loss allegedly suffered by the Singer Master Trust (Master Trust) resulting from the Debtor's alleged post-petition breach of its fiduciary duty as Master Trust sponsor arising from the execution of a land purchase agreement. In opposition, the Debtor contends that the agreement did not bind the Plan to purchase the land, but only called for an option to purchase and only if certain conditions were satisfied. According to the Debtor, those conditions were never satisfied, so the Plan was not obligated to consummate the sale, and therefore, no damages could arise from the transaction. The claim of damages is comprised entirely of attorney's fees and costs, accountants fees and other attendant expenses the Plan claims to have incurred in conjunction with litigation which resulted over this transaction.

The facts relevant to resolution of this controversy, as established at the final evidentiary hearing, are as follows:

During the time relevant, the Debtor was the sponsor of its retirement plan, known as the Singer Master Trust (Master Trust). Under the Master Trust, the Debtor was authorized to appoint the Named Fiduciary for Asset Management. David Redmond (Redmond), who served as the Debtor's President and Chief Executive Officer, was also appointed to act as the Named Fiduciary for Asset Management for the Master Trust. Under the Master Trust, the Debtor was charged with the ultimate responsibility of supervising all investments of Pension Plan assets. The Northern Trust Company (Northern Trust) was named as Trustee for the Master Trust.

In early 1990, Redmond was approached by Fred Bullard (Bullard), a local businessman and land developer. Bullard suggested to Redmond a possible investment by the Master Trust in real estate. This investment

included two components: an investment in land located in Osceola County, Florida, known as the Gateway property, and land located in Jacksonville, Florida, known as Queen's Harbor. The Gateway Property was involved in a foreclosure at the time, and the initial suggestion by Bullard was for the Plan to purchase the Gateway Property outright. Ultimately the Plan choose to finance Bullard's purchase of the land, taking back a mortgage on the property. This mortgage loan was approved and closed by Redmond in March, 1990. Bullard defaulted on the interest payment due in September 1990, and Redmond allowed the interest to be capitalized into the loan. Shortly thereafter, Victoria Clear was appointed as Named Fiduciary for Asset Management of the Bicoastal Pension Plan. On March 30, 1991, the Gateway note fully matured and when the note was called, a second default resulted. The Plan was then forced to foreclose on the Gateway Property.

The Gateway property comprised only the first chapter of Loral's claim against the Debtor, which was resolved by this Court with the entry of an order on April 7, 1995. In that opinion, the Court found that the investment in the Gateway Property was in fact a breach of fiduciary duty, however, because the Plan still owned the property, and because the Court found that the property was valuable, the Plan was only damaged in the amount of the reasonable attorney fees incurred for the foreclosure and litigation.

What is currently before this Court involves the second portion of the land investment proposed by Bullard, the Jacksonville property known as Queen's Harbor. During the relevant time, Bullard was president of Queen's Harbor Yacht & Country Club, Ltd., a limited partnership which owned a real estate development in Jacksonville called Queen's Harbor Yacht & Country Club.

In January 1991, Clear contacted Richard Watson (Watson), the Plan's enrolled actuary and inquired whether it would be advisable for the Plan to invest a substantial amount of Plan assets in real estate. Watson informed Clear that several troublesome issues surrounding the Plan at that time would make such an investment ill-advised. These issues,

in Watson's opinion, included Bicoastal's pending bankruptcy, the assertion by the Pension Benefit Guaranty Corporation that a funding deficiency might exist as to the plan; and pending litigation between Bicoastal and the Defense Logistics Agency, which could potentially result in a substantial claim against Trust assets. Watson advised Clear that it was important to keep Trust assets invested in liquid assets and on a short-term, rather than long-term, basis.

In early February, 1991, Bullard met with Clear to discuss the Gateway property and his inability to meet the note when it came due in March. At that meeting, Bullard described his project at Queen's Harbor. After that meeting, Clear traveled to Jacksonville to meet with Bullard and to "walk the property." Several days later, Clear contacted the accounting firm of KPMG Peat Marwick and sought its advice as to whether the Plan could purchase real estate. Bullard informed Clear that there was some urgency with regard to the purchase, because an option related to the project was due to expire. Within the following week, Clear hired a Gainesville attorney to handle the transaction, if it came to fruition.

Concerned with the continuing "critical issues" facing the Plan, Watson sent a letter to Redmond outlining the potential negative results to the Plan, which may occur, and advised against any long-term investment. A copy of this letter was sent to Clear, Peat Marwick and John Cooleen, general counsel for the Debtor. In response to Watson's letter, Clear and her attorney, Jeffrey Chang had a telephone conference with Watson. The conference was not productive and was aborted. Instead, Chang faxed Watson a request for clarification of certain points, including what would be reasonable and realistic investments for the Plan. Clear was advised of the potential that future employee contributions would have to be met by current plan assets. In addition, Clear was advised by professional investors at Towers Perrin that Clear should focus on short-time horizon investments until "near term uncertainties settle and the threat of termination ceases."

Notwithstanding all the advice against the investment in real estate, Clear executed a contract on behalf of the Plan to purchase "the vacant land located at Jacksonville, Duval County, Florida." The contract purported to be executed and effective as of March 13, 1991, although it is undisputed that the contract had not even been drafted at that time, and Clear simply signed the last page. Non-final drafts of the contract were exchanged between the lawyers representing the parties as late as March 16, 1991. The final contract named Bullard as Seller of Parcel A, Queen's Harbor Yacht & Country Club as Seller of Parcel B and the Singer Master Trust as Purchaser. Clear executed the contract as "Named Fiduciary for Asset Management" of the Singer Trust. Bullard signed for himself, and for the Queen's Harbor Yacht & Country Club, but did not designate in what capacity he executed the contract.

The Contract as drafted provided that the Master Trust agreed to purchase the "property described in Exhibit A" for a purchase price of $38.5 million. In addition, the Singer Plan was to loan Bullard an additional $5 million to be used for the development of a country club on the Queen's Harbor property. The Contract did not include an Exhibit A which provided a legal description of the property the Trust was purchasing, nor did it ever define Parcel A or Parcel B. The contract did not require an ernest money deposit. The $5 million loan did not specify an interest rate, repayment schedule or other customary terms.

The Contract also contained significant conditions precedent to closing. Pursuant to the contract, these conditions were not subject to reasonable efforts or similar standards, thus, if the Purchaser determined that it could not satisfy the conditions, the Contract could be terminated.

The Contract required the Seller to provide:

a survey of the Property within 30 days of March 13, 1991 which shall show no encroachments onto the property from any adjacent property, no encroachments by or from the property onto any adjacent property, no violations of any recorded building lines, restrictions, or easements affecting the property except as shown on Exhibit C.

title commitment at Purchaser's expense. If the title commitment discloses exceptions to title other than the permitted title exceptions, Seller shall have 30 days from the delivery of the commitment to Purchaser to have all such exceptions removed from the title commitment to provide evidence thereof to Purchaser, and if Seller fails to have all such exceptions removed, Purchaser shall elect on or before the closing date to i) terminate the agreement . . . ii) accept title subject to those exceptions.

Furthermore, the Contract made the Purchaser's obligation to close the transaction subject to the Purchaser satisfying each of the following:

soil samples, borings and percolation and other feasibility tests and topographic, engineering and environmental studies showing that the physical aspects and condition of the property are acceptable to Purchaser and suitable for Purchaser's intended use of the Property;

determining to its satisfaction that water and sanitary and storm sewer services presently exist at the perimeter of the Property and are unconditionally available to serve the Property and are sufficient to service the Purchaser's intended use . . . obtain letters from the appropriate utility companies stating that each of the services can be made available to serve the property;

Obtaining or satisfying itself that it can obtain building permits, approvals, certificates and other authorizations from such municipal and other public agency and authorities as may, in the Purchaser's judgment, be necessary or appropriate for the intended use of the property;

satisfying itself there are no fees or payments for schools, parks, or any other public entity facilities which are required;

Obtain the release or relocation acceptable to purchaser of any easements affecting the property which interfere, in Purchaser's sole determination, with purchaser's intended use of the property;

Prior to closing, obtaining the valid and effective enactment by the City of Jacksonville, the following:

an ordinance zoning the property ... satisfactory to purchaser to permit purchaser to develop the property in accordance with the intended use;

approval for necessary curb cuts, driveway permits from the Florida Department of Transportation and other necessary governmental bodies which will permit development of the property in accordance with Purchaser's intended use;

obtaining or receiving professionals' opinion as to the ability to obtain all agreements, permits, or authorizations required, in Purchaser's opinion to permit the property to be developed.

Furthermore, the Contract reserved to the Purchaser's sole discretion that:

if the Purchaser determines that it will be unable to satisfy any of the conditions precedent set forth in this Section, within the applicable time period, Purchaser may, at its option, elect to terminate this agreement by notice given to Seller not later than 30 days after the expiration of such time period, in which event the Purchaser shall furnish Seller with copies of Purchaser's studies as hereinbefore described, and thereupon, neither party shall have any further rights or obligations hereunder.

Finally, the Contract provided for a closing date of March 20, 1991.

Sometime between March 15, and March 20, Clear contacted Northern Trust and instructed it to wire $44 million in Pension Plan funds to a newly established bank account in Florida, ostensibly for the purpose of completing the closing scheduled for the March 20th. Northern Trust refused to wire the funds without the opportunity to review the proposed transaction. Northern Trust took the position that, as Trustee to the Pension Plan, it had a fiduciary duty to investigate the Queen's Harbor transaction. Therefore, it initially undertook steps to assess whether to implement Clear's instruction to transfer the $44 million.

In the meantime, control of Bicoastal had shifted. A new majority was appointed to the board of directors, and a new chief executive officer was named. Among the first actions undertaken by the new Board and new CEO was a review of the Queen's Harbor transaction. On April 25, 1991, the new Board voted to fire Clear as the Pension Plan's Named Fiduciary for Asset Management; and rescinded her direction to Northern Trust to transfer $44 million. The new Board also retained Northern Trust to "exercise independent discretion in determining whether to purchase Queen's Harbor on behalf of the Trust.

On May 31, 1991, Northern Trust sent a letter to Bullard stating that it would not close the Queen's Harbor transaction for four reasons:

1) Clear had not been authorized under ERISA to sign the Contract;

2) the transaction itself was imprudent and improper under ERISA;

3) the Contract was unenforceable under Florida Law; and

4) numerous conditions precedent in the Contract had not been met.

Following the termination of Clear's employment and of the Queen's Harbor transaction, litigation ensued. Bullard sued the Pension Plan and its Trustee both in state and federal court, seeking specific performance of the Queen's Harbor Contract, as well as damages for each. Northern Trust and the Pension Plan defended the litigation, requiring the retention of professionals, and incurring millions in litigation costs. These costs comprise the basis of the administrative expense claim asserted by Loral against the Debtor.

Based upon these facts, Loral contends that Clear breached the fiduciary duty of the Debtor owed to the beneficiaries of the Master Trust and the duties on Pension Plans imposed by the Employee Retirement Income Security Act of 1974 (ERISA) 29 U.S.C. § 1001, et seq., and accordingly Loral contends that the Debtor is liable for the damages incurred by the Trust as a result of the Queen's Harbor litigation. Furthermore, Loral contends that such claim is an administrative claim under § 503(b)(1)(A) because in defending the action filed by Bullard, the

Debtor authorized the payment of the fees and costs sought and such fees and costs were actual and necessary costs and expenses of preserving the estate.

In support of its position, Loral relies on the trust document which governs the Singer Master Trust, and which imposes a fiduciary obligation upon Clear to prudently invest the assets of the Singer Pension Plan. In addition, Loral contends that because the Debtor had the responsibility to appoint all fiduciaries for the Singer Plan, and was at all times relevant to this matter the Plan Sponsor, the Debtor was responsible for overseeing the conduct of the named fiduciaries and is vicariously liable for breaches committed by those fiduciaries. *See Whitfield v. Tomasso*, 682 F.Supp. 1287, 1305 (E.D.N.Y.1988).

The Debtor challenges Loral's claim for reimbursement of expenses to the Pension Plan. In support of the objection, the Debtor advanced four primary contentions. First, the Debtor contends that the due diligence conducted by Clear was sufficient and the investment was proper and the Debtor did not breach its fiduciary duty owed to the Pension Plan; second, that because the contract was facially invalid and unenforceable, there was no obligation imposed on the Plan to close the purchase and therefore the conduct by Clear cannot constitute a breach of fiduciary duty; third, that since the Pension Plan is substantially over-funded, the Pension Plan suffered no losses and, therefore, is not entitled to any damages; lastly, the Debtor contends that the claim does not meet the requirements of § 503(b) of the Bankruptcy Code to qualify as an administrative claim entitled to priority under § 507(a) of the Code.

■ Considering these contentions seriatim, it is appropriate to start the inquiry with the duty and conduct of Clear in connection with the transaction under consideration. It cannot be gainsaid that the Master Trust Agreement clearly charged Clear with the duty as a fiduciary duty to carry out her responsibilities prudently, and for the exclusive benefit of the Plan's beneficiaries, and in accordance with the requirements of ERISA. ERISA § 404(a)(1) sets forth the standards of fiduciary conduct, which provides, in pertinent part, that a fiduciary must discharge his or her duties "solely in the interest of the participants and beneficiaries" and:

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims

(D) in accordance with the document and instrument governing the plan.

29 U.S.C. § 1104(a)(1). These obligations are referred to as "The Prudence Requirement" and the "Exclusive Benefit Requirement."

■ The Prudence Requirement and the Exclusive Benefit Requirement are the key protections afforded by ERISA. *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). The Prudence Requirement requires a fiduciary making a Pension Plan investment decision to give "appropriate consideration" to those facts and circumstances that, given the scope of the investment duties, the fiduciary should know are relevant to the particular investment or courses of action involved, and to act accordingly. 29 U.S.C. § 1104(a)(1)(B). ERISA does not excuse a fiduciary's breach of duty because the fiduciary acted in good faith. *Martin v. Walton*, 773 F.Supp. 1524 (S.D.Fla.1991). In addition, ERISA principles hold fiduciaries to a more exacting standard than common law of trusts standards. *Donovan v. Mazzola*, 716 F.2d 1226 (9th Cir.1983); *Martin v. Walton, supra.* Section 404(a)(1)(B) explicitly holds fiduciaries to the standard of a prudent expert, rather than that of a prudent layman. In situations where Pension Plan fiduciaries are making loans, the fiduciary is held to the standard of professional bankers and bank investment advisers. *Katsaros v. Cody*, 744 F.2d 270 (2d Cir.) *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). The fiduciary's

conduct must be evaluated as of the time of the investment, without considering the ultimate success or failure of the investment. *Donovan, supra.*

In evaluating the proposed Queen's Harbor transaction, it is necessary to consider both the purchase of the land and the loan to Mr. Bullard as one investment as they arose out of the same document. However, because the criteria for evaluating a loan and a real estate purchase differ, each will be discussed separately.

In evaluating the loan by the Pension Plan to Mr. Bullard, the Court may consider several factors in determining the prudence of the fiduciary's decision, including:

(1) Whether the fiduciary sought the advice of independent counsel in making the decision;

(2) The interest rate of the loan compared to other assets in the fund's portfolio;

(3) The ability of the borrower to repay the loan;

(4) The value of the collateral pledged to secure the loan;

(5) The fiduciary's evaluation of the value of the collateral;

(6) Whether a guaranty of the loan was executed;

(7) The financial ability of the guarantor to pay the borrower's obligations in the event of a default.

*Donovan v. Walton,* 609 F.Supp. 1221 (S.D.Fla.1985); *Brock v. Walton,* 794 F.2d 586 (11th Cir.1986); *Katsaros, supra; Donovan v. Mazzola, supra.*

Considering these issues seriatim, this Court is satisfied that Clear did not satisfy the standard of prudent conduct required of a fiduciary who manages pension plan assets. While Clear conducted some inquiry concerning the feasibility of the Queen's Harbor project, this inquiry was far short of prudent due diligence. Moreover, she was advised repeatedly that, because of the pending legal problems with Bicoastal, such as, the litigation with the Defense Logistic Agency; the uncertain fate of the reorganization process; a possible claim by the Pension Benefit Pension Corporation, that it would be unwise to invest Plan assets in long-term investments.

While Clear "walked the property," the property was never appraised. She signed a contract which was not even drafted and did not include a legal description of the property which was intended to be purchased on behalf of the Pension Plan. Keeping in mind that this transaction was to cost the Plan $38.5 million, Clear's lackadaisical approach is nothing short of gross negligence. To add insult to injury, Clear also agreed, on behalf of the Plan, to loan $5 million to Bullard, the same Bullard who had already defaulted on the Gateway project and whose creditworthiness was never checked. This loan was to be evidenced by a Promissory Note which did not specify an interest rate, had no repayment schedule nor other terms which are customary of loans in general, especially a loan of this size. In sum, the foregoing should not leave anyone in doubt that Clear did breach her duty as the Named Fiduciary for Asset Management.

It should be noted that whether or not the contract for the Queen's Harbor transaction was ultimately enforceable is not an issue which requires substantial consideration. This Court is satisfied that while the Queen's Harbor transaction was never consummated, and while in fact, there may never have been a valid, enforceable contract, Clear did sign the so-called contract on behalf of the Pension Plan and this contract was ultimately the subject of litigation. At the time that the document was created, the transaction was itself a breach of fiduciary duty and the ultimate disposition of the transaction should not absolve the fiduciary from their responsibility.

■ This leaves for consideration the amount of damages, if any, to be awarded to Loral and the classification, vel non, of those damages, as an administrative claim. The damages asserted by Loral are comprised of expenses associated with the litigation of the Queen's Harbor transaction, including attorney's fees, expenses, appraisers, accountants and interest. These expenses were incurred by the Plan, which this Court had already found to be substantially over-funded. Based on this undisputed fact, the Debtor contends that the over-funded status of the

Pension Plan indicates that the disbursement of Pension Plan funds for the payment of expenses related to the Queen's Harbor transaction did not result in any harm to the beneficiaries of the Plan. Therefore the Debtor argues that there are no actual damages suffered by the Pension Plan, and therefore, it is not entitled to be compensated under ERISA.

Moreover, the Debtor contends that any award in this matter to the Plan would increase the over-funded status and the result, in turn, would extend the period during which Loral will not have to make contributions to the Pension Plan in order to maintain funding. In response, Loral contends that at the time that it assumed sponsorship of the Singer Plan, the Debtor was paid $15 million for its interest based on the over-funding of the Pension Plan and that Loral will not be unjustly enriched by an award of damages. Loral further contends that the over-funded status should not be a basis upon which to deny recovery of damages to a Pension Plan for breaches of fiduciary duty because that would enable fiduciaries of over-funded plans to breach their duty without the risk of having to reimburse the plan.

With respect to the amount of damages which were incurred, the Debtor contends that the expenses incurred in the Queen's Harbor litigation were excessive and abusive while, Loral, of course argues that they were all necessary and reasonable expenses. Loral further indicates that the Debtor authorized most or all of the expenses incurred.

It is important to point out what is and what is not under consideration. This not an Application for Allowance of Compensation to a professional appointed pursuant to § 327 and sought pursuant to § 330. Instead, what is required is a determination of whether the expenses incurred were a result of the breach of duty by Clear, and in what amount the Plan suffered as a result of this breach, if any.

There is evidence in this record that Northern Trust, in fact, assumed the responsibility of the Queen's Harbor project within three weeks of the execution of the Agreement by Ms. Clear. It immediately retained a law firm and in spite of the fact that the Agreement executed by Clear was obviously not a binding Agreement, not only because it was defective as a matter of law, but also because several conditions precedent were not fulfilled, attempted to terminate the agreement and litigation ensued. The Agreement was nothing more than an option rather than an obligation to purchase the property. This litigation could have been easily avoided by terminating the Agreement based on the obvious legal defects of the contract as well as the sellers' failure to fulfill the conditions precedent to closing. Rather, Northern Trust attempted to terminate the Agreement on the theories that Clear had no authority to enter into the Agreement that the Agreement violated ERISA and based on lack of legal description.

In the course of the litigation the Plan paid $3,004,091.00 to attorneys and other professionals, all retained by Northern Trust. The bulk of these fees and expenses were incurred after Loral assumed the sponsorship of the Plan, and the Debtor no longer had anything to do with the administration of the Plan. The Debtor certainly had no responsibility for supervising the litigation and had no control over the conduct of the litigation or to monitor the expenses. Northern approved all invoices and paid them not with its money, Loral also approved the invoices and paid them again not with its own money.

In addition even the proof presented in support of the actual payments to these professionals leaves a lot to be desired and falls short of the degree of proof required to warrant to honor the request under consideration even disregarding the grossly excessive amount sought, as discussed in detail above.

Thus, in the last analysis this Court is satisfied that Loral's request for reimbursement of the monies paid to the professionals cannot be recognized and allowed in any amount. In light of the foregoing it is unnecessary to consider or to indicate whether the amount sought even assuming without admitting would be entitled to an administrative claim status pursuant to Section 503(b) of the Code.

246

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the Amended Application for Allowance and Payment of Fees and Expenses Associated with the Queen's Harbor Property Litigation filed by Loral Librascope Pension Plan is hereby disapproved.

DONE AND ORDERED.