In re BICOASTAL CORP., Debtor.

The LORAL LIBRASCOPE PENSION
PLAN, Appellant,

v.

BICOASTAL CORP., Appellee.

No. 96–229–CIV–T–17B.

United States District Court,
M.D. Florida,
Tampa Division.

Nov. 15, 1996.

**1000**

Harley Edward Riedel, II, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, W. Todd Boyd, Katz, Barron, Squitero, Faust & Berman, P.A., Miami, FL, John H. Pelzer, Ft. Lauderdale, FL, for Bicoastal Corporation.

Richard Michael Blau, Holland & Knight, Tampa, FL, for Loral Librascope Pension Plan.

## ORDER

KOVACHEVICH, District Judge.

This cause comes before the Court on appeal from the Bankruptcy Court's Order Disapproving the Amended Application for Allowance and Payment of Fees and Expenses Associated with the Queen's Harbor Property Litigation filed by Loral Librascope Pension Plan, entered on December 19, 1995, by Chief Bankruptcy Judge Alexander L. Paskay. Appellant asks this Court to reverse the damages portion of the Liability Order, and remand the case with instructions that the Bankruptcy Court enter a supplemental order awarding appropriate damages to the Pension Plan for Bicoastal's breach of fiduciary duty. This Court has jurisdiction. 28 U.S.C. § 158.

## ISSUES

I. Whether the Bankruptcy Court erred in finding that Loral was not entitled to recover any damages under ERISA as a result of Clear's breach of fiduciary duty because the bulk of the fees claimed by Loral were incurred after Loral assumed sponsorship of the Plan and Bicoastal no longer had anything to do with the Plan.

II. Whether the Bankruptcy Court erred in finding that Loral failed to meet its burden of proof regarding the payment of the litigation costs expended to defend against lawsuits regarding Queen's Harbor.

III. Whether the Bankruptcy Court erred in failing to award Loral prejudgment interest.

IV. Whether the litigation costs Loral seeks to recover are administrative claims recoverable under § 503 of the Bankruptcy Code.

## STANDARD OF APPELLATE REVIEW

In reviewing bankruptcy court judgments, the district court functions as an appellate court. The district court is bound by the findings of facts made by the bankruptcy court unless it determines them to be clearly erroneous. The burden is on the appellant to show the bankruptcy court's finding is clearly erroneous. Fed.R.Bankr.P. 8013; *In re Downtown Properties, Ltd.*, 794 F.2d 647 (11th Cir.1986); *In re Fernandez*, 132 B.R. 775 (Bankr.M.D.Fla.1991). However, "if the bankruptcy court's findings are 'silent or ambiguous as to an outcome determinative factual question,'" then this court must remand the case to the bankruptcy court for further review. *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir.1990).

Appellant is entitled to a *de novo* review in all cases where the determination is solely based on a conclusion of law. In such cases, the district court will conduct an independent review of the case and the legal significance accorded by the bankruptcy court to the facts. *In re Fasano/Harriss Pie Co.*, 71 B.R. 287, 290 (W.D.Mich.1987); *In re Goerg*, 930 F.2d 1563, 1566 (11th Cir.1991); *In re Owen*, 86 B.R. 691 (M.D.Fla.1988).

As to issue I, this Court has been asked to determine if the Bankruptcy Court's

finding that the actions of the Plan's Named Fiduciary, Victoria Clear, did not result in any damages is a question of law which this Court reviews *de novo.*

■■■ As to issues II and IV, the proper standard of review is also *de novo* review. However, the award of prejudgment interest is discretionary, and is reviewed to determine whether there was an abuse of discretion.

### FACTS AND PROCEDURAL HISTORY

Bicoastal Corporation, d/b/a Simuflite, f/k/a The Singer Company (Bicoastal) was the sponsor of its retirement plan, the Singer Master Trust (Master Trust). Under the Master Trust, Bicoastal had the authority to appoint the Named Fiduciary for Asset Management (Named Fiduciary). David Redmond (Redmond), Bicoastal's President and Chief Executive Officer, during the time relevant to this appeal, was appointed by Bicoastal to be the Named Fiduciary.

In early 1990, Redmond was approached by Fred Bullard (Bullard) who suggested that the Master Trust purchase two pieces of real estate, one in Osceola County, Florida, known as the "Gateway" property, and one in Jacksonville, Florida, known as "Queen's Harbor." The Plan financed Bullard's purchase of the Gateway property, taking back a note and mortgage. Bullard defaulted on the Gateway loan, and the Plan was forced to foreclose on the property. Prior to Bullard's final default on the loan, Victoria Clear (Clear) replaced Redmond as the Named Fiduciary of Bicoastal's pension plan.

In January, 1991, Clear contacted Richard Watson (Watson), the Plan's enrolled actuary, to discuss whether a substantial investment of Plan funds in real estate would be prudent. Watson advised Clear that such an investment would not be wise because of circumstances existing at that time. The circumstances included Bicoastal's pending bankruptcy, pending litigation between Bicoastal and the Defense Logistics Agency, as well as the possible existence of a funding deficiency in the Plan. Watson advised Clear that Trust assets should be kept liquid by investing only in short-term investments, and not long-term investments.

Despite this advice, and the subsequent default by Bullard on the Gateway loan, Clear, as the Named Fiduciary, executed a contract with Bullard for the Plan to purchase "Queen's Harbor." While the contract purported to be effective as of March 13, 1991, it is undisputed that the contract had not been drafted at that time, and Clear simply signed the last page. The final contract named Bullard and Queen's Harbor Yacht and Country Club as the Sellers, and the Master Trust as Purchaser. The contract provided for a purchase price of $38.5 million dollars. Additionally, the Master Trust was to loan Bullard an additional $5 million dollars for development of a country club on the property. The contract provided no legal description of the property, nor did it require a deposit. Also, no interest rate, repayment schedule or other terms were specified for the loan portion of the transaction.

However, the contract did specify several conditions to be fulfilled by both Seller and Purchaser prior to closing. The Seller was required to provide a survey of the property within thirty days of the effective date of the contract, as well as title commitment at the Purchaser's expense. Additionally, the contract provided that the Purchaser's obligation to complete the transaction was subject to the Purchaser being able to satisfy certain conditions. These conditions included:

1. obtaining soil tests, soil borings, percolation and other feasibility tests and topographic, engineering and environmental studies showing the physical aspects and the condition of the property are acceptable to Purchaser and suitable for Purchaser's intended use of the property;

2. determining to its satisfaction that water and sanitary and storm sewer services presently exist at the perimeter of the property and are unconditionally available to serve the property . . . ;

3. obtaining letters from the appropriate utility companies which will be providing

gas, electric and telephone services to the property that each can be used by Purchaser at the customary rates charged by the utility concerned, and that the utilities to be provided will be sufficient to serve Purchaser's intended use of the property;

4. obtaining or satisfying itself that it can obtain building permits, approvals, certificates and other authorization from and agreements with such municipal agencies and authorities as may, in Purchaser's judgment, be necessary or appropriate for the intended use of the property;

5. satisfying itself that there are no fees or payments, for schools, parks, or any other public entity facilities which are required by an owner of the property;

6. obtaining the release or relocation acceptable to Purchaser of any easements affecting the property which may interfere with the Purchaser's intended use of the property; and

7. obtaining the valid and effective enactment by the City of Jacksonville of an ordinance zoning the property ... satisfactory to Purchaser to permit Purchaser to develop the property in accordance with Purchaser's intended use; approval for necessary curb cuts, driveway permits from the Florida Department of Transportation; and obtaining professional opinions as to the ability to obtain all agreements, permits, or authorizations required to develop the property.

Moreover, the contract provided:

If Purchaser, in its sole discretion, determines that it will be unable to satisfy any of the conditions precedent set forth in this Section 11.01 within the applicable time period, Purchaser may, at its option, elect to terminate this agreement by notice given to the Seller not later than thirty days after the expiration of such time period, in which event the Purchaser shall furnish Seller with copies of Purchaser's studies as hereinbefore described, and thereupon, neither party shall have any further rights or obligations hereunder.

The closing date of the contract was March 20, 1991.

Prior to March 20, Clear contacted Northern Trust, trustee of the Master Trust, and instructed it to wire $44 million in pension funds in order to close the transaction. Northern Trust refused to wire the funds, advising Clear that, as trustee, Northern Trust had a fiduciary duty to investigate the Queen's Harbor transaction.

During this time, control of Bicoastal shifted. The new board and new CEO began a review of the Queen's Harbor transaction. On April 25, 1991, Clear was terminated as Named Fiduciary, and her instructions to Northern Trust concerning the funds transfer were rescinded. On May 23, 1991, Bicoastal retained the services of Northern Trust under a retainer agreement whereby Northern Trust was given exclusive authority and discretion with respect to whether to proceed with the Queen's Harbor transaction.

Northern Trust, on the advice of its counsel, notified Bullard that it would not proceed with the purchase of the Queen's Harbor real estate. The reasons provided were that Clear, as Named Fiduciary, lacked authority under the Trust and the Employee Retirement Income Security Act (ERISA) to enter into the contract, Clear's signing of the contract violated fiduciary duties under ERISA, and the contract was unenforceable under Florida law because the contract provided no description of the property.

Bullard then brought suit against the Pension Plan and its trustee in both state and federal court seeking damages and specific performance of the contract. Northern Trust defended the litigation, incurring millions in litigation costs. These costs comprise the bulk of Loral's administrative expense claim against the debtor.

On August 12, 1992, Northern Trust filed an administrative expense claim against Bicoastal who was a Chapter 11 debtor before the Bankruptcy Court, claiming the damages suffered by the Master Trust constituted administrative expenses under § 503 of the Bankruptcy Code.

In September, 1992, Bicoastal sold the Pension Plan to Loral. A special fund which was approved by the Bankruptcy Court was set up in order to redress damages that may have resulted from litigation concerning the Gateway and Queen's Harbor real estate. In the Bankruptcy Court's order dated September 24, 1992, Loral as the new sponsor of the Pension Plan, was permitted to assume prosecution of Northern's administrative expense claim against Bicoastal. At Bicoastal's request, the Bankruptcy Court bifurcated the Gateway and Queen's Harbor portions of the litigation.

The Bankruptcy Court held final evidentiary hearings regarding Loral's administrative expense claim concerning the Queen's Harbor litigation on January 18–20, 1995. After some intervening discovery issues, the hearings resumed and concluded on June 19, 1995. On December 19, 1995, the Honorable Alexander Paskay, Chief Judge of the United States Bankruptcy Court for the Middle District of Florida, entered his Order on Debtor's Objection to Administrative Claim of Loral (Queen's Harbor). The Bankruptcy Court concluded that, while Clear's action of executing the Queen's Harbor agreement was a breach of the fiduciary duty owed to the pension plan as the Named Fiduciary, Loral's administrative expense claim could not be allowed in any amount.

## ANALYSIS

### I. Damages Caused by Breach of Fiduciary Duty

■ Section 409(a) of ERISA provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries ... shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate...." 29 U.S.C. § 1109(a). The language of this section indicates that a causal connection is required between the breach of fiduciary duty and the losses sustained by the pension plan. *Brandt v. Grounds,* 687 F.2d 895, 898 (7th Cir.1982). The Bankruptcy Court concluded that while Clear's execution of the Queen's Harbor contract as Named Fiduciary was a breach of fiduciary duty owed to the pension plan, Clear's breach did not result in the specific damages Loral now claims because the contract was merely an option contract.

### A. Expenses Relating to Execution of the Contract

■ Appellant argues that the Bankruptcy Court's conclusion is erroneous, because approximately $500,000 of the claimed expenses were directed by either Clear or Bicoastal. Included among these expenses were fees paid by Clear with Pension Plan funds to lawyers, appraisers and other professionals to structure the Queen's Harbor transaction, as well as the $150,000 retainer fee paid to Northern Trust to assume responsibility for the Queen's Harbor transaction after Bicoastal's termination of Clear.

The Bankruptcy Court found that, while Clear's execution of the contract constituted a breach of fiduciary duty owed to the Pension Plan, no damages had been sustained by the Pension Plan by its execution because the contract was merely an option contract.

The Court finds this conclusion to be in error, and reverses the decision of the Bankruptcy Court as to ERISA damages arising from the execution of the contract. If Clear had never executed the contract at all, none of these initial expenses would have been incurred. In other words, but for Clear's execution of the contract, no fees would have been paid to lawyers, appraisers and other professionals prior to the repudiation of the contract. The fact that the contract was merely an option contract does not mean that the execution of the option contract did not result in any expenses. *Some* expenses were incurred *solely* as a result of the execution of the contract. For example, $40,330.00 was paid to the Real Estate Research Group to prepare an appraisal of the Queen's Harbor property and $4,185.40 was paid to Danese

Title & Abstract Company to perform the title search and title commitment for Queen's Harbor. Therefore, the Court finds it was error for the Bankruptcy Court to conclude that the expenses incurred prior to the retention of Northern Trust were not caused by Clear's breach of fiduciary duty.

■ The additional expense incurred to retain Northern Trust for the purpose of assuming the additional responsibility of looking into the Queen's Harbor transaction would not have occurred but for Clear's execution of the contract. The Bankruptcy Court's conclusion that these expenses did not constitute ERISA damages is based on the reasoning that at the time the contract was executed, the Pension Plan was not obligated to purchase the property because it was an option contract that required certain conditions precedent to closing to be fulfilled.

This reasoning does not take into account conditions in the contract that the parties to the contract were required in good faith to attempt to fulfill *before* their obligations under the contract would cease. The fulfillment of these conditions had economic consequences. Therefore, the Court concludes it was error for the Bankruptcy Court to conclude that the expenses associated with the contract's conditions were not the result of Clear's breach of fiduciary duty, and recoverable under ERISA.

B. Expenses Related to Litigation of the Contract

The Court must now address those expenses that were incurred by Northern Trust *after* its retention by Bicoastal to look into the Queen's Harbor transaction. The bulk of these expenses were legal fees paid to defend against the various lawsuits brought by Bullard and others after repudiation of the Queen's Harbor transaction.

Appellant argues that these expenses were also a direct result of Clear's breach of fiduciary duty, because had Clear never executed the Queen's Harbor contract, lawsuits would not have been brought for the contract's repudiation. This Court understands the Bankruptcy Court's conclusion as to this issue to rest upon the Bankruptcy Court's findings that (1) the contract was merely an option, and had Northern Trust exercised its rights under the contract, lawsuits would not have resulted, or the lawsuits would have been less expensive; and (2) the bulk of the fees expended by Northern were incurred after Loral assumed sponsorship of the plan and Bicoastal no longer had anything to do with the administration of the plan. Appellee urges this Court to adopt the Bankruptcy Court's conclusions as to these issues. This Court will address each of these issues.

1. Bicoastal's Knowledge of Northern Trust's Decisions

(a) Litigation Tactics

■ First, the Bankruptcy Court, in its order, and Appellee, in its brief, devote a large part of their argument to discussion that the expenses incurred by Northern to defend against suits brought as a result of the repudiation of the contract would not have occurred if Northern had exercised the option provided to it under the contract. The option was to inform the Sellers of Queen's Harbor that several conditions precedent to closing had not been fulfilled, and as a result the Plan was under no obligation to purchase the property. Northern Trust, on the advice of its counsel, Sonnenshein, chose to disaffirm the contract based upon the contract's apparent invalidity, and Clear's lack of authority to enter into such a contract. Appellee enumerates in its brief the failure on the part of Northern Trust to demand from the Sellers a survey and title commitment, the failure of Northern Trust to respond to the Seller's "self-serving" representations that various representations it was required to make precedent to closing were true, and Northern Trust's failure to write a letter to the Sellers particularizing any unfulfilled condition.

Appellant argues that these arguments amount to "Monday-morning quarterbacking" and "rank speculation" about how the

issues should have been litigated. In support, Appellant points out that the Sellers of the Queen's Harbor property vigorously contested the repudiation of the contract, claiming that all conditions precedent had been satisfied. In other words, the issue of fulfillment of the conditions precedent would have been litigated in any event.

Additionally, Appellant argues that Appellee's hindsight about how the issues should have been litigated "begs the question" as to who would have been responsible for the fees incurred, no matter what litigation strategy had been adopted.

In its order the Bankruptcy Court acknowledged that:

> It should be noted that whether or not the Contract for the Queen's Harbor transaction was ultimately enforceable is not an issue which requires substantial consideration. This Court is satisfied that while the Queen's Harbor transaction was never consummated, and while in fact, there may never have been a valid, enforceable contract, Clear did sign the so-called contract on behalf of the Pension Plan and this contract was ultimately the subject of litigation. At the time that the document was created, the transaction was itself a breach of fiduciary duty and the ultimate disposition of the transaction should not absolve the fiduciary from their responsibility.

*In re Bicoastal Corp.*, 191 B.R. 238, 244 (Bankr.M.D.Fla.1995). Despite this acknowledgment, however, the Bankruptcy Court went on to conclude:

> In the course of the litigation the Plan paid $3,004,091.00 to attorneys and other professionals, all retained by Northern Trust. The bulk of these fees and expenses were incurred after Loral assumed the sponsorship of the Plan and the Debtor no longer had anything to do with the administration of the Plan. The Debtor certainly had no responsibility for supervising the litigation and had no control over the conduct of the litigation or to monitor the expenses.

*Id.* at 245.

Appellant argues that the Bankruptcy Court's conclusion that as to supervision and control of the litigation is not supported by the record because prior to the September, 1992, sale of the Pension Plan to Loral, Bicoastal did monitor and approve the claimed expenses, and Bicoastal remained a fiduciary of the Pension Plan until its sale. Appellee argues that after terminating Clear, Bicoastal retained Northern Trust under an agreement whereby Northern Trust was vested with "sole responsibility and exclusive authority and discretion" over the Queen's Harbor contract, and Northern Trust was to independently engage legal counsel whose fees were to be paid by the Master Trust.

■ ERISA "allows for a fiduciary to delegate a fiduciary duty." *Willett v. Blue Cross and Blue Shield of Alabama*, 953 F.2d 1335, 1340 (11th Cir.1992). ERISA provides:

> (1) The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.

29 U.S.C. § 1105(c)(1) (1985). However, the delegation provided for in Section 1105(c)(1) is subject to section 1105(c)(2). *Willett*, 953 F.2d at 1340. A fiduciary who delegates a fiduciary duty may still be liable for the breach of that duty if "the named fiduciary would otherwise be liable in accordance with subsection (a) of this section." 29 U.S.C. § 1105(c)(2)(B) (1985); *Willett*, 953 F.2d at 1340. Section 1105(a) provides for the circumstances under which a fiduciary would be liable for a breach of fiduciary duty of another fiduciary. One of the circumstances under which such liability would be imposed includes "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a)(3) (1985). As the *Willett* court noted, "Under ERISA, a fiduciary must always be prepared to reassume a delegated fiduciary duty when it becomes apparent to the fiduciary that the

party responsible for performing the duty has breached its obligation." *Willett*, 953 F.2d at 1341.

While this Court finds Appellant's arguments persuasive, they rest upon a factual determination that Bicoastal knew prior to the repudiation of the Queen's Harbor contract on May 31, 1991, (1) that Northern Trust was going to repudiate the contract and (2) that Northern Trust had failed to fulfill its duties under the contract by particularizing the unfulfilled conditions on the part of the Seller. This Court finds the Bankruptcy Court's factual findings on this outcome determinative fact to be unclear. If Bicoastal knew prior to the repudiation of the contract that Northern Trust had breached its fiduciary duty by failing to fulfill its duties under the Queen's Harbor contract by notifying the Seller of unfulfilled conditions and requiring the Seller to provide a survey and title commitment as required by the contract, and that Northern Trust was going to adopt the riskier manner in which it chose to repudiate the contract, then, pursuant to *Willett*, Bicoastal should have been prepared to reassume its fiduciary duty and correct any breaches.

Both Bicoastal and Northern Trust had a fiduciary duty as to the Queen's Harbor contract. In order to determine if Bicoastal breached that duty, the Court needs to know what person at Bicoastal knew of the tactical decisions being made as to litigation of the subject contract, and at what time that person acquired that knowledge. The Court remands this case for further findings on this issue.

(b) Reasonableness of Litigation Expenses

 This Court finds there is conflicting testimony in the record as to who was responsible for monitoring the reasonableness of legal fees, Northern Trust or Bicoastal, and who *actually* did monitor the fees.

Appellant argues that John Cooleen, assistant general counsel of Bicoastal and Named Fiduciary for Administration, reviewed and approved the legal fees incurred by Northern Trust. Appellee argues that John Cooleen did not review the legal fees for reasonableness, that Northern Trust reviewed the bills for reasonableness, and John Cooleen simply initialed the bills pursuant to instructions from Northern Trust. Specifically, evidence in the record shows that Kendall Kay, Second Vice President for Northern Trust, would send a letter with a bill enclosed to John Cooleen regarding legal fees, stating that Northern Trust had reviewed the fees and believed them to be fair, and requesting John Cooleen's approval for payment. Appellant further argues that even if Mr. Cooleen did not review the bills for reasonableness, his failure to do so constituted a breach of fiduciary duty for which Bicoastal should be held liable under Sections 1109 and 1105(a) of ERISA.

Appellant points out the record demonstrates that John Cooleen, who served both as assistant general counsel, and as Named Fiduciary for Administration, did review the bills Northern Trust forwarded to him.

All this Court knows about the legal fees paid is the amount, $3,004,091.00. Bicoastal argued to the Bankruptcy Court that these expenses were excessive and abusive, and Loral argued that these were reasonable and necessary expenses. Since this Court finds the Bankruptcy Court's findings on the reasonableness of the legal fees to be unclear, the case is remanded to the Bankruptcy Court for further findings as to the amount of reasonable and necessary expenses.

II. Burden of Proof as to Litigation Costs

 The next issue the Court must address is whether Appellant met its burden of proof regarding the payment of the litigation costs expended to defend against lawsuits regarding Queen's Harbor. The Bankruptcy Court stated in its order that "the proof presented in support of the actual payments to these professionals ... falls short of the degree of proof required." *In re Bicoastal Corp.*, 191 B.R. 238, 245 (Bankr.M.D.Fla. 1995). Appellant's trial exhibit No. 76 pro-

vided a damages summary. However, not all of the tabs of this exhibit were admitted into evidence by the Bankruptcy Court because Appellant failed to provide witnesses who could properly authenticate the business records. Appellee points out, and the record supports, that out of 29 tabs, only tabs 1, 7 and 20–29 were admitted into evidence. However, Appellant received authorization from the Bankruptcy Court to conduct additional depositions of three witnesses, James Manna, Andrea Baker, and Harold C. Hirshman so that Appellant could attempt to properly authenticate the business records evidencing these expenses.

■ Appellee's only objection at the time the Appellant attempted to offer the depositions into evidence when the evidentiary hearings reconvened was that Mr. Hirschman had already testified live at trial. Appellee did not make any objection at that time as to the authentication of the business records. The Bankruptcy Court overruled the objection and admitted the depositions, along with the attached business records evidencing Appellant's expenses for the remaining tabs into evidence. Since Appellee did not object when the business records were tendered along with the depositions at the final evidentiary hearing, Appellee waived its objection to their admissibility. *See Typographical Service, Inc. v. Itek Corp.,* 721 F.2d 1317, 1320 (11th Cir.1983).

Since the Bankruptcy Court admitted the depositions along with the business records into evidence, this Court can only conclude that Appellant did in fact provide properly admissible evidence as proof of its expenses. Therefore, it was error for the Bankruptcy Court to conclude that Appellant failed to meet its burden of proof regarding payment of the Queen's Harbor litigation expenses.

## III. Prejudgment Interest

■ The next issue the Court must address is whether the Bankruptcy Court erred when it failed to award Appellant prejudgment interest. The Bankruptcy Court concluded that Appellant's administrative ex-

pense claim could not be recognized in any amount, and as a result it did not address the issue of whether Appellant was entitled to prejudgment interest. An award of prejudgment interest to a prevailing party under ERISA is within the sound discretion of the trial court. *Moon v. American Home Assur. Co.,* 888 F.2d 86, 89–90 (11th Cir.1989). However, prejudgment interest should be awarded to a prevailing ERISA plaintiff to make the party whole by compensating for not having use of the money awarded. *Reid v. Prudential Insurance Co. of America,* 755 F.Supp. 372, 376 (M.D.Fla.1990). Since the Court has concluded that the Bankruptcy Court erred in failing to conclude Appellant's expenses constituted ERISA damages, the Court remands the case to the Bankruptcy Court for a determination on the issue of prejudgment interest.

## IV. Administrative Claim under Section 503

■ The final issue the Court must address is whether the Appellant's ERISA damages constitute an administrative expense claim under Section 503 of the Bankruptcy Code. Since the Bankruptcy Court concluded that Appellant's expenses did not constitute ERISA damages, it did not address whether these expenses would constitute administrative expenses under Section 503 of the Bankruptcy Code, except to state that the expenses are unreasonable without any explanation as to why they are unreasonable. Therefore, the Court remands the case to the Bankruptcy Court for a determination of whether Appellant's ERISA damages constitute an administrative expense under § 503 of the Bankruptcy Code. Accordingly, it is

**ORDERED** that the Order Disapproving the Amended Application for Allowance and Payment of Fees and Expenses Associated with the Queen's Harbor litigation of the United States Bankruptcy Court for the Middle District of Florida is **reversed in part,** and **remanded in part,** for further proceedings consistent with this opinion.